FORM TO BE USED BY A PRISONER IN FILING A CIVIL RIGHTS COMPLAINT

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

**Darius Heimer Gittens,**

(Enter above the full name of the plaintiff in this action)

V.

**Ryan Pepper, et al,**

_____

_____

(Enter the full name of the defendant of defendants in this action)

COMPLAINT

Civil Action No. _____

(To be supplied by the Clerk of the Court)

---

## INSTRUCTIONS; READ CAREFULLY

1.      This complaint must be legibly handwritten or typewritten, signed by the plaintiff and   subscribed to under penalty of perjury as being true and correct. All questions must be answered concisely in the proper space on the form. Where more space is needed to answer any question, attach a separate sheet.

2.      In accordance with Rule 8 of the Federal Rules of Civil Procedure, the complaint should contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, (2) a short plain statement of the claim showing that you are entitled to relief, and (3) a demand for judgment for the relief which you seek.

3.      You must provide the full name of each defendant or defendants and where they can be found.

4.      You must send the original and one copy of the complaint to the Clerk of the District Court. You must also send one additional copy of the complaint for each defendant to the Clerk. Do not send the complaint directly to the defendants.

5.      Upon receipt of a fee of $400.00 (a filing fee of $350.00, and an administrative fee of    $50.00), your complaint will be filed. You will be responsible for service of a separate summons and copy of the complaint on each defendant.  See Rule 4, Federal Rule of Civil Procedure.

6.    If you cannot prepay the $400.00 fee, you may request permission to proceed in forma pauperis in accordance with the procedures set forth in the application to proceed in forma pauperis. See 28 U.S.C. §1915. (If there is more than one plaintiff, each plaintiff must separately request permission to proceed in forma pauperis.)

7.    If you are given permission to proceed in forma pauperis, the $50.00 Administrative Fee will not be assessed. The Clerk will prepare and issue a copy of the summons for each defendant. The copies of summonses and the copies of the complaint which you have submitted will be forwarded by the Clerk to the United States Marshal, who is responsible for service. The Marshal has USM-285 forms you must complete so that the Marshal can locate and serve each defendant. If the forms are sent to you, you must complete them in full and return the forms to the Marshal.

## QUESTIONS TO BE ANSWERED

1a.    Jurisdiction is asserted pursuant to (CHECK ONE)

  _XXX_ 42 U.S.C. §1983 (applies to state prisoners)

  ____ Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971) and 28 U.S.C. § 1331 (applies to federal prisoners)

  If you want to assert jurisdiction under different or additional statutes, list these below:
**Please see (page 1) of the attached (57 page) certified complaint dated May 18, 2021 for additional jurisdiction (paragraph 1).**

1b.    Indicate whether you are a prisoner or other confined person as follows:

  __ Pretrial detainee

  __ Civilly-committed detainee

  __ Immigration detainee

  **XXX** Convicted and sentenced state prisoner

  __ Convicted and sentenced federal prisoner

  __ Other: (please explain)_____

2.   Previously Dismissed Federal Civil Actions or Appeals

If you are proceeding in forma pauperis, list each civil action or appeal you have brought in a federal court while you were incarcerated or detained in any facility, that was dismissed as frivolous or malicious, or for failure to state a claim upon which relief may be granted. Please note that a prisoner who has on three or more prior occasions, while detained in any facility, brought an action or appeal in a federal court that was dismissed as frivolous or malicious, or for failure to state a claim upon which relief may be granted, will be denied in forma pauperis status unless that prisoner is under imminent danger of serious physical injury. See 28 U.S.C. § 1915(g).

a.   Parties to previous lawsuit:

Plaintiff(s): _____

_____

Defendant(s):_____

_____

b.   Court and docket number:_____

c.   Grounds for dismissal:  ( )    frivolous    ( ) malicious

( )    failure to state a claim upon which relief may be granted

d.   Approximate date of filing lawsuit:_____

e.   Approximate date of disposition:_____

If there is more than one civil action or appeal, describe the additional civil actions or appeals using this same format on separate sheets.

3.   Place of Present Confinement? **New Jersey State Prison**

4.   Parties

(In item (a) below, place your name in the first blank and place your present address in the second blank. Do the same for additional Plaintiffs, if any.)

a.   Name of plaintiff: **Darius Heimer Gittens**

Address: New Jersey State Prison, P.O. Box 861, Trenton, NJ, 08625

Inmate#: SBI #875223E, ID #1079439

b. First defendant:

Name: Ryan Pepper

Official position: At the times relevant to the complaint he was a Correction Police Sergeant; and currently a Lt.

Place of employment: At the times relevant to complaint he was at Bayside State Prison.

How is this person involved in the case?

(i.e., what are you alleging that this person did or did not do that violated your constitutional rights?)
Please see facts section in the attached (57 page) certified complaint dated 5/18/2021, at pages (7) through (52).

c. Second defendant: Please find all additional (55) defendants

Name: listed on page (1) of the attached (57) page certified complaint dated 5/18/2021.

Official position: Please see parties section of the attached (57 page) certified complaint dated 5/18/2021, at pages (2) through (5).

Place of employment: "                    "

How is this person involved in the case?

(i.e., what are you alleging that this person did or did not do that violated your constitutional rights?)

"                                                                    "

d. If there are more than two defendants, attach a separate sheet. For each defendant specify: (1) name, (2) official position, (3) place of employment, and (4) involvement of the defendant.

5.    I previously have sought informal or formal relief from the appropriate
      administrative officials regarding the acts complained of in the
      Statement of Claims on page 6.

      __XXX__ Yes        ____No

      If your answer is "Yes," briefly describe the steps taken, including how
      relief was sought, from whom you sought relief, and the results.

      Please see attached (57 page) certified complaint dated 5/18/2021 for
      comprehensive attempts at resolving all matters in the complaint found
      throughout the section on facts pages (7) through (52).

      _____

      If your answer is "No," briefly explain why administrative remedies
      were not exhausted.

      _____
      _____
      _____
      _____

6.    Statement of Claims

      (State here as briefly as possible the facts of your case. Describe how
      each defendant violated your rights, giving dates and places. If you do
      not specify how each defendant violated your rights and the date(s)
      and place of the violations, your complaint may be dismissed. Include
      also the names of other persons who are involved, including dates and
      places. Do not give any legal arguments or cite any cases or statutes.
      If you intend to allege a number of related claims, number and set
      forth each claim in a separate paragraph. Use as much space as you
      need. Attach a separate sheet if necessary.)

                              CLAIMS:

      Please see attached (57 page) certified complaint dated 5/18/2021 at
      pages (52) through (57).

      _____
      _____
      _____
      _____

please see attached (57 page) certified complaint dated 5/18/2021.

7.   Relief

(State briefly exactly what you want the Court to do for you. Make no legal arguments. Cite no cases or statutes.)

Please see attached (57 page) certified complaint dated 5/18/2021 at page (57).



8.  Do you request a jury or non-jury trial? (Check only one)

(X) Jury Trial ( ) Non-Jury Trial

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _18_ day of _May_ , 20_21_

_Darius Gittens_

Signature of plaintiff*

(*EACH PLAINTIFF NAMED IN THE COMPLAINT MUST SIGN THE COMPLAINT HERE. ADD ADDITIONAL LINES IF THERE IS MORE THAN ONE PLAINTIFF. REMEMBER, EACH PLAINTIFF MUST SIGN THE COMPLAINT).

Darius Heimer Gittens, pro se
SBI #875223E, ID #1079439
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey, 08625

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CIVIL ACTION (42 U.S.C. 1983)

Docket #_____

---

Darius Heimer Gittens,

        Plaintiff,

   V.

Ryan M. Pepper, Raimon Ng, Jonathan P. Gramp, James M. Stigliano, Timothy Maines, Rebecca L. Smith, Anna M. Miglio, Gregory S. Achinko, John B. Gardner Donna L. Alexander, Shameca K. Lawson, Robert P. Devol, Mark R. Broadwater, Amanda J. Whilden, Thomas A. Togno, John F. Rollar, James C. Ross, Steven Sooy, Willie J. Bonds, Marcus O. Hicks, Bruce Davis, David W. Richards, Duane M. Grade, Edward Soltys, Dan DiBenedetti, Anthony Gangi, John Blakslee, Melissa Matthews, Mervin Ganesh, John Falvey. Karin Burke, Nicole Sargenti, Jennifer Malinowski, Melinda S. Haley, Deborah Cope, Michelle Ricci, Suzanne Lawrence, Bettie Norris, Ebony Vaught, Amy Emrich, Cherice Hampton, Jessica McDuffie, Erica Stem, Jeffrey Crothers, Wayne Manstream, Patrick Nogan, Elizabeth C. DiBenedetto, Reginald E. Easley, Leonard J. Goffredi, Tiffany Fairweather, Kyle I. Brown, Daniel E. Kemble, Anthony Gadecki, Craig M. Sears Chadd W. Lackey and Garyn Nathan. <u>Each</u> of these named defendants are sued in the <u>individual</u> and <u>official</u> capacity <u>extant</u> at the times and places that underpin each act and omission alleged herein to be the bases of this complaint.

        Defendants.

---

## C O M P L A I N T

### JURISDICTION

   (1)  This is a civil action authorized by 42 U.S.C.§ 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States of America.  This court has jurisdiction under 28 U.S.C. § 1331 and 1334 (a) (3).  Plaintiff seeks relief pursuant to 28 U.S.C. § 2201 and 2202.  Plaintiff's claims for injunctive relief are authorized by 28 U.S.C. § 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure and Supplemental Jurisdiction pursuant 28 U.S.C. § 1367. Additional jurisdiction is 42 U.S.C. Sec. 1997 (e) and the Americans with Disability Act 29 U.S.C. Sec. 794, and 42 U.S.C. 12101-12213.

### VENUE

   (2)  The United States District Court for the District of New Jersey is an appropriate Venue under 28 U.S.C. § 1391 (b) (2) because it is where the events giving rise to these claims occurred.

## PARTIES

(3)  Plaintiff Darius Heimer Gittens is currently an inmate confined at the New Jersey State Prison in Trenton, New Jersey hereinafter **NJSP.**

(4)  Defendant Ryan Pepper was at all times relevant a New Jersey Department of Corrections Police Sergeant at Bayside State Prison hereinafter **BSP.**

(5)  Defendant Raimon Ng was at all times relevant a New Jersey Department of Corrections Senior Corrections Police Officer hereinafter **S.C.P.O.** at BSP.

(6)  Defendant Jonathan P. Gramp was at all times relevant the Administrator of BSP.

(7)  Defendant James M. Stigliano was at all times relevant the Associate Administrator of BSP.

(8)  Defendant Timothy Mains was at all times relevant the assistant Superintendent at BSP.

(9)  Defendant Rebecca L. Smith was at all times relevant the Executive Assistant at BSP.

(10) Defendant Anna M. Miglio was at all times relevant a Corrections Police Sergeant at the BSP.

(11) Defendant Gregory S. Achinko at all times relevant the Principal Investigator of the SID at BSP.

(12) Defendant John B. Gardner was at all times relevant an SID investigator at BSP.

(13) Defendant Donna L. Alexander was at all times relevant an SID Investigator at BSP.

(14) Defendant Shameca K. Lawson was at all times relevant a S.C.P.O. at BSP.

(15) Defendant Robert P. Devol was at all times relevant a S.C.P.O. at BSP.

(16)  Defendant Mark R. Broadwater was at all times relevant a S.C.P.O. at BSP.

(17) Defendant Amanda J. Whilden was at all times relevant a S.C.P.O. at BSP.

(18)  Defendant Thomas A. Togno was at all times relevant a S.C.P.O. at BSP.

(19)  Defendant John F. Rollar was at all times relevant a S.C.P.O. at BSP.

(20)   Defendant James C. Ross was at all times relevant a S.C.P.O. at BSP.

(21)   Defendant Steven Sooy was at all times relevant a S.C.P.O. at BSP.

(22)   Defendant Willie J. Bonds was at all times relevant the Director of Operations at COHQ.

(22A)   Defendant Marcus O. Hicks was at all times relevant the Commissioner of the New Jersey Department of Corrections .

(23)   Defendant Bruce Davis was at all times relevant the Administrator of New Jersey State Prison hereinafter NJSP.

(24)   Defendant David W. Richards was at all times relevant the Associate Administrator at NJSP.

(25)   Defendant Duane M. Grade was at all times relevant the Chief of the SID at NJDOC Central Office hereinafter COHQ.

(26)   Defendant Edward Soltys was at all relevant times a SID Investigator at COHQ.

(27)   Defendant Dan DiBenedetti was at all relevant the Corrections Ombudsman.

(28)   Defendant Anthony Gangi was at all relevant times the Assistant Superintendent of Northern State Prison hereinafter NSP.

(29)   Defendant John Blakslee was at all relevant times the Assistant Corrections Ombudsman.

(30)   Defendant Melissa Matthews was at all  relevant times an Assistant Corrections Ombudsman.

(31)   Defendant Mervin Ganesh was at all relevant times was an associate Administrator at NJSP.

(32)   Defendant John Falvey was at all relevant times an attorney involved in disciplinary, Legal & Regulatory Affairs and Records Custodial in charge of O.P.R.A. records access at COHQ.

(33)   Defendant Karin Burke was at all relevant times the Director of the Office of Legal & Regulatory Affairs at COHQ.

(34)   Defendant Nicole Sargenti was at all relevant times an Executive Assistant to Commissioner Hicks at COHQ.

(35)   Defendant Jennifer Malinowski was at all relevant times the Director of  the Office of  Policy & Planning at COHQ.

(36)   Defendant Melinda S. Haley was at all relevant times a Special Legal Advisor at the Office of Legal & Regulatory Affairs at COHQ.

(37)   Defendant Deborah Cope at all relevant times was the Assistant Commissioner of Operations at COHQ.

(38)   Defendant Michelle Ricci at all relevant times was the Assistant Commissioner of Operations at COHQ.

(39)   Defendant Suzanne Lawrence was at all relevant times the Chief of Staff at COHQ.

(40)   Defendant Bettie Norris was at all relevant times Deputy Commissioner Division of Operations at COHQ.

(41)   Defendant Ebony Vaught was at all relevant times a Secretarial Assistant III at NJSP.

(42)   Defendant Amy Emrich was at all relevant times the Assistant Superintendent at NJSP.

(43)   Defendant Cherish L. Hampton was at all relevant times the Secretarial Assistant 1 at NJSP.

(44)   Defendant Jessica McDuffie was at all relevant times the Secretarial Assistant II at NJSP.

(45)   Defendant Erica M. Stem was at all relevant times the Associate Administrator at NSP.

(46)   Defendant Jeffrey Crothers was at all relevant times the Assistant Superintendent at NSP.

(47)   Defendant Wayne Manstream was at all relevant times a Correction Police Major at the New Jersey Department of Corrections Correctional Staff Training Academy.

(48)   Defendant Patrick Nogan was at all times relevant the Administrator of NSP.

(49)   Defendant Elizabeth DiBenedetto was at all relevant times the Disciplinary Hearing Officer assigned by COHQ.

(50)   Defendant Reginald E. Easley was at all relevant times assigned to SID at COHQ as an Investigator.

(51)   Defendant Leonard J. Goffredi was at all relevant times a SID investigator at South Woods State Prison hereinafter S.W.S.P.

(52)   Defendant Tiffany Fairweather was at all relevant times employed at the Central Office Correspondence Unit.

(53)   Defendant Kyle I. Brown was at all times relevant a Corrections Police Sergeant at BSP.

(54)   Defendant Daniel E. Kemble was at all times relevant a SID Investigator at NJSP.

(55)   Defendant Anthony Gadecki was at all times relevant an SID Investigator at NJSP.

(56)  Defendant Craig M. Sears was at all relevant times a Corrections Police Major at NJSP.

(57)  Defendant Chadd W. Lackey was at all times relevant the Executive Director of the New Jersey Commission of Investigation.

(57A)  Defendant Garyn Nathan was at all times relevant the Assistant Superintendent and chairman of the Claims Committee at BSP.

### PROLOGUE

(58)  For those persons of the jury and those persons otherwise involved as defendants, their attorneys and the court, this prologue is intended to provide a basic understanding of plaintiff's living conditions at Northern State Prison, Bayside State Prison and New Jersey State Prison. Also addressed in this prologue are an explanation of various evolving prison standards and a brief discussion of plaintiff's mind set regarding his understanding of **his** responsibility to follow prison regulations, and his understanding of prison regulations, that correctional staff **must** follow. The next paragraph will start with the evolution of prisons in these United States, and this state, New Jersey.

(59)  Once a person is committed to the New Jersey Department of Corrections -( hereinafter **NJDOC** )- there are regulations in place by state statutes that are expressly developed to limit prisoner access to foods, reading materials, television programs, recreational activities, visits, phone calls, law library and general reading library; and while the prisoner in NJDOC has severe restrictions and controls placed on his and her respective daily activities there, are also statutory regulations expressly authorizing each prisoner in NJDOC be provided with **specific** privileges and rights that are required to be followed by correctional staff; if the prisoner follows specific rules and regulations.  If the prisoner. is required by regulation to certain privileges and certain minimum conditions of confinement, but for the illegal acts or omissions of correctional staff, and that prisoner is denied such privileges and or minimum conditions of confinement, and he or she gathers evidence for use to  complain  in court and or to complain to COHQ officials, it is unconstitutional by  both federal and State of New Jersey  constitutions to  retaliate and  punish that  prisoner for  making complaints or writing a log book to memorialize such matters for use in such complaints.  It is very difficult for a prisoner to prove that he or she has a true claim for being retaliated  by correction staff, because prisoners in prison for violating the rights or mistreatment of others have inherent credibility liabilities;  This case brought by this plaintiff will be proven not merely because of his saying this or that correction employee did  this or that alone, no the proof will be accepted by this jury because they will watch approximately (2) hours of digital security film of both audio and visual, and documents all under the control  of NJDOC officials that will fully support the allegations made in this complaint.

(60)  When a person is convicted of crimes and sentenced to NJDOC he or she finds that contemporary standards of decency are the current foundation that our New Jersey and United States lawmakers have come to rely upon when fostering regulations that create conditions of confinement that are moral, lawful and constitutionally appropriate for prisoners in NJDOC Prisons.

(61)  These standards of decency are the product of over 148 years of

criminal justice refinement by legislatures, judicial decree, and correctional associations.

(62) The American Correctional Association (A.C.A.) is made up of wardens, administrators, superintendents, sheriffs, commissioners, sociologists, psychiatrists and lawmakers. When designing, building, planning and regulating prisons, the publications of the A.C.A. are where guidance on almost every issue can be found; plaintiff possesses copies of these foundational manuals for use at trial.

(63) The aforementioned A.C.A. Standards for Adult Correctional Institutions 3rd & 4th editions set forth evolved and constitutionally acceptable standards, were developed in 1974.

(64) In 1976, "performance standards" were added to Standards for Adult Correctional Institutions. Various correctional institutions through out these United States and this state, New Jersey, due to the age of them, often bring up where they can, policy and procedures, and spatial construct considerations, in order to be vetted pursuant to these performance standards. In an effort to acquire "accreditation".

(65) The A.C.A.'s Manual of Accreditation Policy and Procedure, developed in 1979, evolved to require accredited facilities to be monitored. In order to maintain accreditation, facilities had to maintain the performance standards. Even where full accreditation is not actually possible most prisons in NJDOC model most of it's correctional facilities policy and procedures by incorporation by reference specific A.C.A. standard numbers corresponding to that specific standard. This creates continuity and accountability in NJDOC regulations and policies.

(66) In 1976, the New Jersey Legislature passed the "New Jersey Department of Corrections Act" whereby the Commissioner of the Department of Corrections would oversee promulgation of rules and regulations in adult prisons N.J.S.A. 30:1B-1 through 25. These rules and regulations are the construct N.J.A.C. 10A: et seq. These rules and regulations take the form of policy and procedures known as "IMP's" Level 1 and Level 3 are created/approved by the NJDOC COHQ unit called the " APPM Unit ". These IMP's create rules and regulations that provide for conditions of confinement that are legal, constitutional and well settled.

(67) Plaintiff is going to construct this complaint with facts that are laid out, for the most part, in sequential chronological order with a great deal of reliance on facts, that wherever possible, will incorporate documentary and digital security films taken at the times and places identified from (5) fixed positions in various areas of prisons as well as digital filmed interviews done on (4) separate occasions by (6) SID investigators.

(68) Plaintiff by the following facts will show that he was transferred from Northern State Prison to Bayside State Prison in retaliation for filing a complaint of being assaulted and then while in Bayside State Prison the retaliation escalated by placement into cells and housing units that were infested with giant oriental roaches, and beds designed to torture, cell lights not provided, agreements between correction staff to steal authorized mail and retaliation for reporting the theft of such mail and then false

charges filed with destruction of evidence resulting in **spoliation** and as a result of complaints plaintiff made concerning these matters he was punished. And he was also punished illegally through retaliation for memorializing illegal conditions of confinement and illegal activities by numerous correction employees and then a careful cover-up by supervisory corrections employees at the facility level, and by SID investigators and deliberate indifference of officials in COHQ that were provided over 100 pages of documentary evidence and provided exact times and dates of security films and SID interviews on digital security films, but decided to continue to act to cover-up evidence that established that plaintiff had been falsely accused of violating institutional rules and finally after placing plaintiff into punitive pre-hearing detention personal property was stolen by certain of these correction employees in a vicious maleficent intent and execution in their acts and omissions designed to harm plaintiff which was successful in harming plaintiff.

(69)   There was even complaints by plaintiff of systematic cable TV theft -(piracy)- occurring in all housing units and inside security metal detector sites which caused the inmate welfare fund -(derived from 17% of all inmate commissary profits, that legislative laws strictly prohibit any use by any correction employee)- that funded the cable TV system in each cell to be compromised; thus preventing inmates from benefiting from that privilege; that was just one of many illegal acts done at BSP openly with all attempts to redress was met with an illegal un-written policy and practice designed to pretend redress while all along supervisory correction staff lied and obfuscated in order that inmates would continue to be deprived of cable TV programming, which continued to allow correction staff to obtain clear uninterrupted cable TV programs offered on <u>Direct TV</u> contracted inmate programming. Additionally, plaintiff has an extensive collection of NJDOC O.P.R.A. records, in the thousands of pages, and part of that collection is the Direct TV cable program contract dated 2/28/2019 that defendant **Jonathan Gramp** signed falsely claiming <u>567 units</u> (rooms/cells) being served cable TV when that count was/is substantially higher; this is mentioned because this was one of the areas being investigated by plaintiff that caused correctional staff to retaliate illegally.

(70)   Lastly, plaintive wishes to state very clearly that despite being convicted of crimes, he has not lost respect for law and the rule of law. Further, this plaintiff while going to great effort to develop this complaint, that would not exist but for many correctional staff acting individually and at times in concert to illegally violate plaintiff's rights, for purposes not authorized by their positions as sworn peace officers -(correction Police Officers, Sergeants, Majors and Administrators and staff at NJDOC COHQ)- plaintiff nevertheless believes the vast majority of correction staff are honest law abiding persons; this complaint addresses by contrast only 57 New Jersey State actors (defendants) out of over 8000 overwhelmingly presumed honest employees that are currently working for NJDOC.

<u>FACTS</u>

(71)   On 9/21/2019 while confined at NSP, and with no disciplinary record and with -1 point -(Minus 1 point is a very low and favorable score under the objective inmate classification scoring system)- plaintiff a very well behaved prisoner was assaulted from behind by S.C.P.O. Daniel A. Riquelme at approximately 7:48 A.M. and that assault was captured on the newly installed digital security film system and recorded by Two (2) separate fixed cameras.

(72)   At the time of the assault alleged in paragraph (71) supra, plaintiff was on Saturday morning medication line that was outside, as it was overflow for the actual inside medication line and plaintiff was in discussion with (2) other prisoners who were also waiting for medication. The discussion concerned the withholding of much needed Lexis Nexis computer terminals that had already been acquired by the Education Supervisor.

(73)   Plaintiff upon returning to his housing unit made a formal complaint on the electronic kiosk concerning the assault.   The complaint on that kiosk generated a number **which was: #NSP19041380.**

(74)   After filing that complaint about the assault Plaintiff typed a (2) page letter to defendant Patrick Nogan, the Administrator with reference to the complaint made on the electronic kiosk under #NSP19041380.

(75)   Plaintiff then waited for defendant Nogan to process the assault complaint in discreet fashion along with the SID. Most allegations of assault upon an inmate by correctional staff is referred to the SID.

(76)   On 10/2/2019 plaintiff was ordered transferred from NSP to BSP on orders by defendant Nogan who delegated the filing of the transfer paperwork to defendant Anthony Gangi who then facilitated the transfer on 9/27/2019 when he signed the transfer agreement, Form #CRAU-003.  Plaintiff will provide a complete digest of motive of defendant Gangi to retaliate against plaintiff even beyond this assault matter; this digest will occur later in this complaint.

(77)   Plaintiff arrived at BSP on 10/2/2019 and was placed into a cell in the infamous housing unit called **Housing Unit "B"** and assigned to cell B-143, that contained an inmate on the top of a bunk bed in a cell designed for (1) person.

(78)   B Housing Unit is the place where <u>S.C.P.O. Fred Baker</u> was murdered by a homosexual prisoner <u>Steven Beverly</u> on the morning of July 30, 1997. There is a placard hung on the wall dedicating that unit in memoriam to Fred Baker' death. His tragic death came after Baker had ordered a separation of cell mates, the illicit sexual partner of prisoner Beverly as he, Baker, was leaving for his days off, and on the morning of his return from days off, July 30, 1997, is when he was killed by Beverly; this is a matter of public record.

(79)   Upon plaintiff entering cell B-143, attempted to sit down on his assigned <u>bottom bunk</u> −(it should be noted here that plaintiff has a medical condition that restricts his housing assignments to **bottom bunk & ground floor**)− he was not able to sit up in that bottom bunk, −(plaintiff's height in a sitting position was (35) inches but this bunk bed with mattress had only (28) inches head clearance; additionally there was no required pillow nor a working light that was also required, by well settled law.

(80)   Plaintiff asked his new cell mate to explain the bed height and light problems and was told that BSP was being used to punish and crush inmate rights that are allowed at the other prisons in NJDOC and that plaintiff should realize that anything he earned as a privilege at other prisons like art, music or incentive packages would all be refused for possession once

plaintiff received his property, and further, he warned plaintiff that law
work was viewed as a threat to officers at BSP and that plaintiff would be
in danger if he was viewed as a jail house lawyer. At the conclusion of
this conversation, which lasted about (5) hours, plaintiff learned how
officers and inmates spent each day, which was later verified personally
by plaintiff, which prompted plaintiff to start a diary log book as a means
to memorialize every day all contacts with correction staff and the things
they did, and the things they allowed or disallowed plaintiff, everything
logged for use in court and writing complaints and eventually a book on this,
the most horrible and dangerous prison he had experienced.

(81) As soon as plaintiff was able he constructed a consecutively pre-
numbered 50 page diary log book which started 10/3/2019 when he was allowed
to purchase an 8½ x 14 yellow lined pad of paper purchased in emergency
commissary purchase; and he started to write each time he was allowed out
of his cell, the times of food, phone, shower and electronic kiosk, etc.,
and after every entry a line was drawn across each page horizontally, and
every new entry would have the date written under that line, and in that
manner a person can see the exact date and page number of each entry. These
are facts that will become central to this complaint as you will see further
along, infra. <hen plaintiff arrived in Trailer 2 he added (50 more pages)
to the diary log book for a total of (100 pages).

(82) BSP had been plagued by abusive corrections staff even prior to
Fred Bakers death, but after his death BSP had hundreds of prison inmates
beaten and illegally punished for years resulting in hundreds of victims
filing lawsuits this is a matter of well known public record. Which plaintiff
became aware of by reading news and court accounts of BSP; none of these
reports could prepare plaintiff for what he was going to experience first
hand, starting on 10/2/2019, and then on 12/3/2019 at the beginning of a
specific identifiable series of acts and omissions by certain below named
defendants to illegally obfuscate, obstruct plaintiff from access to O.P.R.A.
records that started with the illegal confiscation of authorized O.P.R.A.
records authorized under tracking #171444 by defendant Shameca K. Lawson.

(83) Before plaintiff launches into the 12/3/2019 O.P.R.A. records
#17144 theft and post theft retaliations, plaintiff must first provide a
great deal of facts so that this court and jury has the necessary information
to enable a clear understanding of each factor that supports plaintiff's
allegations made in this complaint.

(84) This court and the jury that will hear and decide this complaint
will find plaintiff taking a great deal of effort to explain facts in detail
that may seem unnecessary. But the case law, that is to say, cases decided
by New Jersey state and federal courts and the United States Supreme Court,
make convicted prisoners rights very limited, to an extent that only very
specific acts or omissions by a defendant can form the legal basis upon which
an inmate (prisoner) such as plaintiff is, will be allowed to come to court
and a jury, very much not the normal standard a free person can go to court
with and have a jury weigh those facts and factors as would cause a court
or jury to find against a defendant in a civil rights lawsuit. It is the
reason this plaintiff must be very precise and seemingly overly detailed.
Plaintiff asks this court and jury to have patience with plaintiff's
marshaling of facts in this complaint.

(85)  Plaintiff has established a record of integrity in his civil rights litigation going back to 1987. As a pro se litigant, an inmate represents his or her own legal interests and they do not have an attorney to hide behind when presenting their cases before a court or jury and therefore are held to account to a very high standard since their alleged facts are done in the first person for all intents and purpose, and plaintiff has hundreds of pages of documents that have been submitted to courts in New York and New Jersey that have always been well received without a single incident of a court having found any material written statement to be false or disingenuous, this needs to be stated here because plaintiff will provide information concerning active lawsuits that he was prosecuting in 2019 when he was transferred from NSP on 10/2/2019 to BSP.

(86)  Normal free people can communicate their complaints of mistreatment by hiring an attorney, calling the police, contacting various agencies by phone or letter, not so an inmate in a New Jersey prison.  In New Jersey a prisoner writes letters and asks their family to contact NJDOC officials. But when he goes to the courts as a result of a 1996 Act of Congress called the Prisoner Litigation Reform Act (called PLRA), a prisoner (plaintiff) must file complaints via an established administrative procedure commonly known as an inmate grievance procedure.  In NJDOC that procedure is controlled by a Level 1 IMP #IMM.002.IRS.001  titled "Inmate Remedy System".  In NJDOC there is an electronic kiosk that an inmate (plaintiff) may use to file complaints.  It is a Two part system.  Part One is called an inquiry, it is a necessary component to filing a grievance.  First the prisoner files the inquiry complaint waits (16) days then must file a grievance  which is part Two, and wait (30) days; once these time periods elapse the prisoner (plaintiff), if no corrective action has resolved the complaint, can then proceed to a court, it is a very involved process where the prisoner almost never has the complaint resolved in his or her behalf, even after following a court action, and where there is court assistance or relief it is a process that takes months to years, and during such process every attempt to appear as a viable process is employed, by NJDOC employees, while in reality the attorney for NJDOC employees, and the court spends it's time trying to dismiss the prisoner's case through some minor procedural misstep by the prisoner. Plaintiff is not like other prisoner pro se litigants, in that he rarely files court papers incorrectly and only files a court complaint when he can support it with truth and law. The reason plaintiff points this out is not a position born from ego but because it is a fact; if plaintiff files a document in court it will always be proven to be the truth  and this can be tested going back to 1987; since plaintiff's court filings is a matter of public record.

(87)  Plaintiff after realizing he was in a prison (BSP) that was dangerous and was already violating his rights, allowed him by law, filed inquiries and grievances to address these complaints as described below in paragraph (88); these complaints will address every complaint plaintiff filed while he was a prisoner at BSP  -(relevant to this complaint)-,  which covered (76) days.  Plaintiff shall list them in paragraph (88) briefly, and where relevant, will address them in more detail, further on in this complaint.

(88) Inquiry **#BSP19024029** and **#BSP19024030** dated 10/3/2019 concering why was plaintiff transferred to BSP, Grievance **#BSP19024033** dated 10/3/2019 concerning not being allowed a pillow, no light and bed 30 inches in height that prevented plaintiff from sitting up in, Inquiry **#BSP19024185** dated 10/5/2019 that concerned plaintiff not being provided his kosher diet, Inquiry **#BSP19024187** dated 10/5/2019 concerning receiving property shipped from NSP, Inquiry **#BSP19024418** dated 10/9/2019 concerning not receiving a pillow, Grievance **#BSP19024419** concerning not receiving kosher diet, Grievance **#BSP19024538** dated 10/10/2019 concerning (17) boxes of plaintiff's property that was received at BSP, Inquiry **#BSP19024539** dated 10/10/2019 concerning plaintiff's (13) boxes and (4) large storage containers transferred from NSP to BSP, Grievance **#BSP19024605** dated 10/11/2019 concerning light not being fixed in cell B-143, Inquiry **#BSP19024718** dated 10/12/2019 concerning no light and not being allowed to sit up in bed, Inquiry **#BSP19024768** dated 10/13/2019 concerning not being able to sit up on bed and increasing pain and again pointing out that plaintiff is disabled, Inquiries **#BSP19024901** and **#BSP19024903** dated 10/14/2019 concerning receiving pillow and plaintiff thanking defendant Pepper for delivering it to his cell, Inquiry **#BSP19025098** dated 10/16/2019 concerning plaintiff thanking defendant Gramp for transferring him from horror housing unit B, Inquiry **#BSP19025432** dated 10/20/2019 concerning being denied privilege of continued possession of legal and art supplies transferred from NSP, Grievance **#BSP19025775** dated 10/23/2019 concerning being denied inquiry #BSP19025432, inquiry **#BSP19025816** concerning art/hobby supplies and spices that were earned as privilege for good behavior being refused for possession at BSP, Inquiry **#BSP19025819** dated 10/23/2019 concerning providing information of officers illegal tv sets that have cable tv reception while plaintiff and other inmates have no reception, Inquiry **#BSP19025820** dated 10/23/2019 concerning having peanut butter packets added to plaintiff's kosher diet this has significance with respect to fabricated retaliatory disciplinary charges of 12/17/2019 fully developed further on in this complaint, Grievance **#BSP19026000** dated 10/25/2019 concerning continued theft of officers of the inmate cable system that the law prohibits officers from using, stealing and piracy that was still occurring. Inquiry **#BSP19026025** dated 10/26/2019 concerning the First intentional obstruction of O.P.R.A. record access request **#17144** which will have greater importance later on in this complaint that will establish it as the prime mover in the fabricated disciplinary charges against plaintiff that were filed 12/17/2019, Inquiry **#BSP19027026** dated 11/6/2019 concerning BSP law library obstructed access to the (2) computers that were for Lexis Nexis access, Inquiry **#BSP19027063** dated 11/6/2019 concerning illegal denial of all air exchange due to completely blocked air exchange filters, Inquiry **#BSP19027399** dated 11/11/2019 concerning continued obstruction of O.P.R.A. records request procedure, Inquiry **#BSP19030007** dated 12/10/2019 concerning cell F-128 giant 1 inch roach infestation indicating that (18) of them had been caught and that plaintiff had sent his attorney (7) of them for identification of the species, Inquiry **#BSP19030191** dated 12/12/2019 concerning retaliation of placement in cell F-128 and (6) extra points added to classification score and pain from bottom bunk bed head clearance of (30) inches, Inquiry **#BSP19030411** dated 12/14/2019 concerning defendant Lawson illegal theft of O.P.R.A. authorized records **#17144**, Inquiry **#BSP19030495** dated 12/15/2019 concerning having caught (40) giant roaches from infested cell of plaintiff, Inquiry **#BSP19030496** dated 12/15/2019 concerning pain caused by illegal height of bottom bunk bed exacerbating plaintiff's pre-existing medical shoulder, neck and back conditions and plaintiff again asking for a reasonable accommodation ---------------------------------------------------------------------

(88)   Inquiry **#BSP19024029** and **#BSP19024030**  dated 10/3/2019 concering
why was plaintiff transferred to BSP, Grievance **#BSP19024033** dated 10/3/2019
concerning not being allowed a pillow, no light and bed 30 inches in height
that prevented plaintiff from sitting up in, Inquiry **#BSP19024185** dated
10/5/2019 that concerned plaintiff not being provided his kosher diet, Inquiry
**#BSP19024187** dated 10/5/2019 concerning receiving property shipped from
NSP, Inquiry **#BSP19024418** dated 10/9/2019 concerning not receiving a pillow,
Grievance **#BSP19024419** concerning not receiving kosher diet, Grievance
**#BSP19024538** dated 10/10/2019 concerning (17) boxes of plaintiff's property
that was received at BSP, Inquiry **#BSP19024539** dated 10/10/2019 concerning
plaintiff's (13) boxes and (4) large storage containers transferred from
NSP to BSP, Grievance **#BSP19024605** dated 10/11/2019 concerning light not
being fixed in cell B-143, Inquiry **#BSP19024718** dated 10/12/2019 concerning
no light and not being allowed to sit up in bed, Inquiry **#BSP19024768** dated
10/13/2019 concerning not being able to sit up on bed and increasing pain
and again pointing out that plaintiff is disabled, Inquiries **#BSP19024901**
and **#BSP19024903**  dated 10/14/2019 concerning receiving pillow and plaintiff
thanking defendant Pepper for delivering it to his cell, Inquiry **#BSP19025098**
dated 10/16/2019 concerning plaintiff thanking defendant Gramp for
transferring him from horror housing unit B, Inquiry **#BSP19025432** dated
10/20/2019 concerning being denied privilege of continued possession of legal
and art supplies transferred from NSP, Grievance **#BSP19025775** dated 10/23/2019
concerning being denied inquiry #BSP19025432, inquiry **#BSP19025816** concerning
art/hobby supplies and spices that were earned as privilege for good behavior
being refused for possession at BSP, Inquiry **#BSP19025819** dated 10/23/2019
concerning providing information of officers illegal tv sets that have cable
tv reception while plaintiff and other inmates have no reception, Inquiry
**#BSP19025820** dated 10/23/2019 concerning having peanut butter packets added
to plaintiff's kosher diet this has significance with respect to fabricated
retaliatory disciplinary charges of 12/17/2019 fully developed further on
in this complaint, Grievance **#BSP19026000** dated 10/25/2019 concerning
continued theft of officers of the inmate cable system that the law prohibits
officers from using, stealing and piracy that was still occurring. Inquiry
**#BSP19026025** dated 10/26/2019 concerning the First intentional obstruction
of O.P.R.A. record access request **#17144** which will have greater importance
later on in this complaint that will establish it as the prime mover in the
fabricated disciplinary charges against plaintiff that were filed 12/17/2019,
Inquiry **#BSP19027026** dated 11/6/2019 concerning BSP law library obstructed
access to the (2) computers that were for Lexis Nexis access, Inquiry
**#BSP19027063** dated 11/6/2019 concerning illegal denial of all air exchange
due to completely blocked air exchange filters, Inquiry **#BSP19027399** dated
11/11/2019
concerning continued obstruction of O.P.R.A. records request procedure,
Inquiry **#BSP19030007** dated 12/10/2019 concerning cell F-128 giant 1 inch
roach infestation indicating that (18) of them had been caught and that
plaintiff had sent his attorney (7) of them for identification of the species,
Inquiry **#BSP19030191** dated 12/12/2019 concerning retaliation of placement
in cell F-128 and (6) extra points added to classification score and pain
from bottom bunk bed head clearance of (30) inches, Inquiry **#BSP19030411**
dated 12/14/2019 concerning defendant Lawson illegal theft of O.P.R.A.
authorized records **#17144**, Inquiry **#BSP19030495** dated 12/15/2019 concerning
having caught (40) giant roaches from infested cell of plaintiff, Inquiry
**#BSP19030496** dated 12/15/2019 concerning pain caused by illegal height of
bottom bunk bed exacerbating plaintiff's pre-existing medical shoulder, neck
and back conditions and plaintiff again asking for a reasonable accommodation

for such medical conditions as well as plaintiff's equation of forcing him to remain in that bottom bunk bed as torture, by forcing plaintiff to lean at an extreme angle; and the last complaint of consequence that plaintiff filed while at BSP is the single most instructive complaint that will be explained in detail later in this complaint, for now plaintiff will briefly describe it: Inquiry #BSP19030622 dated 12/16/2019 6:33 P.M. concerning defendant Ng refusing to allow plaintiff to mail a letter to SID that was a (4) page typed letter to defendant Grade dated 12/12/2019 –(this was the first day since 10/2/2019 that plaintiff was permitted access to his word processor)– addressing the 12/3/2019 theft, illegal conditions of confinement, and retaliation concerning O.P.R.A. records #17144 illegal theft by defendant Lawson and defendant Miglio, this inquiry was sent to SID.

(89)   Plaintiff after attempting problem resolution and attempting to stop continued damage, files required administrative inquiries and grievance with and without addendums, but when the problems must be resolved by a court and or a jury, then plaintiff files complaint documents with a court. Plaintiff has been confined in New Jersey County jail and prison since December 16 ,2015 and has (7) separate civil actions in New Jersey State and Federal courts.  As a result of his being own counsel (pro se) he has by necessity, been in possession of a vast amount of case papers and law books and case law, word processor and ribbons and typing paper, envelopes, stamps etc., not to mention the criminal trial transcripts and discovery documents civil and criminal.  Plaintiff mentions this here because when he was forced to move to BSP he had the Second largest amount of legal work ever received at BSP –(as related to plaintiff on 10/10/2019 by the BSP property room officer, Mr. Leith)– (13) boxes and (4) large plastic storage bins); these facts will shortly be developed further in this complaint where this court and jury will want to have that foundational factual information in understanding very secular facts that form the basis of this complex complaint.

(90)   Plaintiff's stay at the horrible B housing unit lasted from 10/2/2019 through 10/15/2019 where each day, person, place, date and time was documented in the diary log book defendants Ng and Pepper stole and then destroyed on 12/17/2019.

(91)   Plaintiff was moved to the housing unit called Trailer 2 complex, on 10/15/2019, and was assigned to a bottom bunk located Trailer 2 East bed A-8-Down. Plaintiff's assignment to this housing unit was made by the Classification Committee that under statutory law would house him there for placement at the farm under full minimum status after ½ of 8 year minimum which would occur on 11/28/2019, plaintiff was scheduled to be assigned, upon return to Classification Committee 12/4/2019, to the farm, because he had –1 point; and assignment to the farm was available to prisoner's with 4 points or less , especially plaintiff who had no violence in his history and was in prison for theft and Third degree burglary.

(92)   Plaintiff continued to write down in his diary log book his daily thoughts and conditions of confinement; most notable, of these conditions was intentional refusal to provide any outside air because the filters were completely clogged, additionally the fire exists were illegally locked to prevent any exit during a fire, and the floors in each trailer bathroom were rotten and the officers were stealing the cable tv (Direct TV) signal for

their secret hidden tv -(hidden inside a custom wheeled cabinet with Two doors and a lock that are used to hide the flat screen tv during supervisory inspections)- while blocking the prisoner access to cable tv signals. Plaintiff addressed these concerns, as indicated in paragraph (88) supra.

(93) on 12/3/2019 defendants Lawson and Miglio illegally stole plaintiff's authorized mail, O.P.R.A. records #17144, this caused plaintiff to hand write a (3) page complaint addressed to SID Investigator John Gardner - (who plaintiff had been interviewed by around 10/4/2019, when the Correction Ombudsman found out plaintiff had been assaulted in NSP on 9/21/2019 without any SID investigation being done, their office sent an E-mail to the SID at BSP to have plaintiff interviewed on film, by Mr. Gardner, and that is why that 12/3/2019 complaint was made to him. Plaintiff mailed that (3) page complaint early on the morning of 12/4/2019, at 6:27 A.M., when he placed it into the Trailer 2 locked wooden mail box that was placed (8 feet in distance) from and under direct observation of defendant Devol who was watching plaintiff deposit same into that mail box.

(94) Later on in the morning at approximately 7:18 A.M. defendant Devol accosted plaintiff and railed on him reciting the contents of the stolen mail O.P.R.A. #17144 demanding to know why plaintiff was asking for documents with officer names and plaintiff told him those documents stolen the previous evening were authorized for plaintiff to possess and that it was illegal to have obstructed plaintiff from possession of them and unauthorized reading thereof and that it was a clear violation of plaintiff's rights secured under the United States and New Jersey Constitution, and he became very angry, his face became very red and he ordered plaintiff to stop talking to him.

(95) About 7:48 A.M. defendant Devol told plaintiff that he was being transferred back to the main BSP compound because plaintiff had reported on officers at the Trailer 2 Complex.

(96) At that time plaintiff was scheduled to go to Classification Committee, so plaintiff was required to pack all his legal work and personal property and move to F housing unit cell #128, that was about 1600 feet distance and then drop off his property inside the cell and hurry to the Classification Committee another approximately 900 feet away.

(97) When plaintiff was seen by the Classification Committee at about 10:40 A.M. he was told by defendant Timathy Mains he was no longer going to be allowed to go to the farm unit because he had received a misbehavior report that added to his points that were now 6 points, 2 points above the 4 point maximum permitted for placement at the farm unit.

(98) plaintiff was assigned cell 128 in the housing unit "F", where he immediately learned that his cell was infested with giant roaches, over (1 inch in length), and that the bunk bed was being illegally employed to torture with intentional design and manufacture that prohibits the ability of prisoners taller than Five feet Three inches tall to sit up in bed, and additionally there was illegally pirated Direct TV cable signals that resulted in the signal being directed only to the illegal Officer flat screen tv and the Officer prisoner workers cells; with all other cells disconnected from the Direct Tv cable feed signal. Plaintiff wrote down in his diary log book in detail far greater than what has been outlined here in this complaint, again, plaintiff included persons names spoken to, times, dates, places, etc.

(99)  As indicated in paragraph (88) supra, plaintiff has continually sought to resolve problems and complaints that were grounded in the United States Constitution, New Jersey Constitution and New Jersey Statutes and codified regulitory laws, policies and procedures that protects plaintiff and his class from violations thereof, and despite the exhausting efforts to protect these rights, this complaint in it's totality will allege facts, and plaintiff will prove at trial, these defendants, as to each of them, specifically attaching each act comprising these alleged violations; and will be shown to have joined together, some of them, to use every form of obstruction and obfuscation, to prevent plaintiff meaningful redress of same, in a continual practice and pattern of overt, and secret Policie(s) that were and are used to prevent plaintiff and his class from meaningful redress of such violations; and in that process the illegal treatment and conditions of confinement forced upon plaintiff are for all intents and purposes, covered up. These defendants refuse to abide the rule of law.

(100)  Plaintiff needs to remind the reader, comprising the Court and jury, that this complaint is not a few simple series of transactions but rather, a very careful exposition of the acts and omissions created and maintained by attorneys that defendants have used to construct and or rely upon to operate in a manner that average persons of average intelligence would be manipulated into believing no violations of plaintiff's constitutionally impacted rights exist, and therefore, this plaintiff must carefully expose with facts those carefully deliberate machinations, so as to provide this court and jury the necessary facts that will provide light and justice to violations of plaintiff's constitutional rights that defendants violate with impunity as alleged by the facts of this complaint.

(101)  Plaintiff complained by phone and writing to his New York friend Mr. Huebner, for assistance in forwarding complaints concerning bunk bed height torture and giant roach infestation and plaintiff also forwarded giant roaches by mail for storage as evidence which were received at his office located at 488 Empire Boulevard, Suite 100, Brooklyn, New York, 11225.

(102)  Plaintiff continued to wait for a response to his (3 page) 12/3/2019 complaint, mailed 12/4/2019, to SID Investigator John Gardner, concerning the theft by defendants Miglio and Lawson of O.P.R.A. 17144, however, unknown to plaintiff, - (until 12/18/2019, discussed in detail below) - that 12/3/2019 complaint was intercepted by defendants Rollar and Devol on 12/4/2019 and read, which then formed the initial conspiracy, between defendants Lawson, Miglio, Devol, Rollar, Maines, Pepper, and Ng to retaliate against plaintiff for filing a complaint to SID for illegal theft of O.P.R.A. documents #17144.

(103)  On or about 12/10/2019 defendant Alexander was ordered to interview plaintiff concerning complaints made to Corrections Ombudsman on 12/6/2019 as well as phone calls and E-mail communications between defendants Grade, and Soltys and plaintiff's ex-wife Elsie Sanchez concerning plaintiff's cell conditions with bed and giant roach infestation and O.P.R.A. records theft.

(104)   On 12/10/2019 defendant Alexander interviewed plaintiff in a room located in the medical clinic and also at and in plaintiff's cell F-128, concerning the theft of O.P.R.A. records #17144 and the giant roach infestation and bottom bunk 28 inch head clearance torture bed, that interview at medical clinic and at cell was all recorded on an SID hand held digital recording that recorded audio and visual. Additionally, the F-Housing Unit Security film also recorded defendant Alexander when she was filming plaintiff and his cell, F-128.

(105)   Plaintiff explained to defendant Alexander and showed her which she filmed, giant roaches that were alive in a clean plastic peanut butter container, the bottom bunk bed head clearance height of (28 inches) and she had plaintiff open his 100 page diary log book so she could film it with her digital video camera because plaintiff had told her in the clinic that he had that diary log book and had been keeping a continual log every day concerning the conditions of his confinement and also that he had stored the receipt issued to him on 12/3/2019 by defendant Lawson, for the illegal confiscation of O.P.R.A. #17144 taped inside the diary log book .

(106)   Plaintiff provided to defendant Alexander the names of each aforementioned defendant who were involved in the theft of O.P.R.A. records #17144 and the retaliation for requesting O.P.R.A. records; it is important that it be stated here again, that plaintiff at this date 12/10/2019 had no knowledge the extent of the retaliation activities regarding the theft of the SID complaint letter dated 12/3/2019 stolen from the outgoing mail on morning of 12/4/2019 by defendants Rollar and Devol, that were being carried out starting on 12/4/2019.

(107)   Since 10/2/2019 plaintiff had been deprived all access to the word processor he uses to construct legal documents – (this word processor that he is using to type this complaint). Plaintiff was finally allowed access to said word processor on or about 12/12/2019, whereupon he constructed a (4 page) letter to the Chief of SID defendant Grade, concerning the 12/3/2019 theft of O.P.R.A. records #17144 and the retaliatory transfer to F Housing Unit cell 128 and the retaliatory falsified Classification Committee's additional assigned scoring points totaling (6). Additionally, plaintiff sought an investigation be conducted concerning defendants Lawson, Miglio, Rollar and Devol. Plaintiff attached to this letter a "Business Remit Form #CUS-126 and a Green United States Postal Service Return Receipt Form #3811 and a United States Postal Service Certified Mail Receipt #7018 3090 0001 3905 8288 that were attached to that letter for certified return receipt service upon defendant Grade.

(108)   Plaintiff attempted to mail the 12/12/2019 letter described in paragraph (107 supra) on 12/13/2019 but every time he had out of cell time he brought the envelope to corrections officers in F Housing Unit to sign the Business remit form which plaintiff is required to have signed before dropping into the locked wooden mail box mounted on the pantry wall in F Housing Unit, but all corrections officers refused to sign it even though they were required to sign it. Plaintiff at that time had not yet found out why they refused to sign it.

(109)   On 12/16/2019 defendant Ng refused to sign the Business Remit Form after holding it in his hands attempting to read the addressee name until he was able to see it then he refused to and told plaintiff that it would be signed later in the evening, offering no reason for further delay.

(110)   Plaintiff filed on the electronic kiosk an inquiry #BSP19030622 dated 12/16/2019 at 6:33 P.M. which plaintiff mentioned in paragraph (88) supra.   This inquiry was filed because plaintiff knew that something was going on behind his back concerning mailing that letter to SID defendant Grade which was very concerning to plaintiff.

(111)   On that evening 12/16/2019 plaintiff wrote a (3 page) letter to Defendant Dan DiBeneditti concerning the (4 page) 12/12/2019 defendant Grade letter with a copy of that letter attached thereto and plaintiff put that letter into the wooden mail box located on pantry wall in F Housing Unit, it was mailed at approximately 6:30 A.M. on 12/17/2019.

(112)   On 12/17/2019 at approximately 6:38 P.M. defendant Ng ordered plaintiff out of cell F-128 for a cell search. At that time plaintiff could not understand why since his cell had been searched only (7) days ago and cells are not searched without cause more than approximately once per month but plaintiff complied and this search was the first overt act by defendants Ng and Pepper in a conspiracy to fabricate charges against plaintiff, steal plaintiff's intellectual computer storage floppy disks that were filled with legal work, outlines for ongoing civil rights litigation concerning Gittens V. Scholtz,1:18-cv-02519-RBK-KMW and Gittens V. Bonds, 1;19-cv-13450-RBK-JS, other stored data, and destruction of plaintiff's diary log book with stored evidence hand written of criminal activities of defendants and plaintiff's private thoughts and memorialization of illegal conditions of confinement which defendant Pepper and Ng destroyed to hide the truth and this caused spoliation of evidence in this complaint and in the disciplinary hearing and Superior Court Appellate Division challenge to fabricated disciplinary charges of 12/17/2019.

(113)   It is important to remind the Court and Jury of the fact that Bayside State Prison Main Compound Housing Units A, B, C, D, E, and F are under continual high security digital Video recording 24 hours each day 365 days a year; plaintiff points this out because he wants it very clear, there is a reason he provides (where possible) the time and date of each alleged fact so that these digital security recordings can be obtained for presentation to the jury at trial, as the best evidence of, acts and omissions of these defendants at Bayside State Prison that plaintiff alleges violates his constitutional rights and the statutory laws alleged in this complaint.

(114)   On 12/17/2019 at approximately 6:25 P.M. defendant Ng went into plaintiff's cell (F-128) and after about 50 minutes he came out of that cell — (as recorded on digital security tape that has been preserved for this jury and court) — with him in possession of (100 page) yellow 8 ½ X 14 lined and consecutively numbered diary log book and an O.P.R.A. records document authorized for plaintiff's possession #16358 — (this O.P.R.A. records authorization # 16358 authorized on February 13, 2019 for plaintiff to possess by defendant Falvey, consisted of (4) lists comprising the names, titles and salaries of all NJDOC employees at New Jersey State Prison, East Jersey State Prison, Bayside State Prison and Central Reception Assignment Facility that was bound by brief staples and tape so that it reads like a book) — then defendant entered the cell next door, spent approximately (2 ) minutes and another cell for approximately (2) minutes then came back to the officer desk area and directly under the lens of the digital security recording system that records the officers desk area, started reading plaintiff's (100 page) diary log book with the O.P.R.A. records #16358 aforementioned.

(115)  Plaintiff watched as defendant Ng clearly had just pretended to search the 2 other cells.  Plaintiff knew it was **pretended searching** because all officers search each cell, in a random cell search,( 3 cells at a time)  to fill their required daily quota;  but they always search each cell for an average of 10 minutes, not how it occurred at that time, clearly there was one cell <u>targeted</u> for a "targeted cell search" and that was plaintiff, as the security film recording establishes.  Defendant Ng was merely acting on film  so he could later <u>pretend</u> he was doing a routine search. The log books of cell searches of plaintiff's call will show the truth.

(116)  After defendant Ng returned to his desk area he contacted some person and then shortly arrived Defendants Pepper and Togno who also went into plaintiff's cell with defendant Broadwater.

(117)  When defendant Pepper arrived on F Housing Unit plaintiff was forced to sit in the middle of the officer area while defendant Pepper took possession of plaintiff's (100 page) diary log book and he is clearly observed flipping over page after page reading plaintiff's private thoughts and the evidence he had collected from 10/3/2019 through 12/17/2019 showing defendant Pepper how many illegal activities were carefully recorded by plaintiff. Defendant Pepper took about (15) minutes where he stayed standing in front of a table or some other elevated surface upon which he was filmed **reading said diary log book.**  One very important fact to note here is that the diary log book was clearly intact at the point he was filmed possessing it, this is an important fact plaintiff will show this court and jury further on in this complaint, that this film is possibly the last recorded evidence of the existence of that diary log book.

(118)  At about 8:00 P.M. defendant Pepper made a phone call and told the person receiving it that plaintiff had been in possession of unauthorized Level 1 & Level 3 IMP's and he then ordered plaintiff be hand cuffed and removed from F Housing Unit, while this was being done plaintiff overheard defendant Broadwater state how he had been ordered to search plaintiff's bed area in Trailer 2 and report O.P.R.A. materials possessed by plaintiff. It should be noted that back on 11/24/2019 defendant Broadwater had searched plaintiff's bed area in Trailer 2 Housing Unit A-8-Down, and plaintiff wrote in his diary log book about that search which was  the O.P.R.A. records possessed by plaintiff at that time.   Note that all O.P.R.A. records that have and are possessed are all authorized by defendant Falvey.

(119)  Defendant Broadwater was also the officer that signed the business remit on the evening of 12/16/2019 that defendant Ng refused to sign that night. This is important because plaintiff found out that the business remit and the 12/12/2019 letter sent certified return receipt requested described in paragraph (107) supra, never was received by defendant Grade.

(120)  Defendant Ng and defendant Broadwater had both observed plaintiff's certified letter and upon information and belief the security film from 12/16/2019 on or about 8:00 - 10:00 P.M. show both of them planning to, and then  removing plaintiff's certified letter from the wooden mail box using a key they accessed to facilitate the theft of that mail.

(121)  Defendants Pepper, Ng, Togno, and Broadwater acted as a team to fabricate evidence against plaintiff for retaliatory reasons and not for

any actual factual bases that would support any charges against plaintiff on 12/17/2019, and at the time they were searching plaintiff's cell their intent was not objectively grounded in any perception of plaintiff being a threat to security, as will be shown later in this complaint by solid facts.

(122)   When plaintiff was being immediately transferred to **Pre Hearing Confinement** – (hereafter PHD)– at the PHD Unit in SWSP, defendant Sooy stated to plaintiff that he had read the diary log book and that it was never going to be returned to plaintiff because defendant Pepper was going to keep it and plaintiff asked him why would his diary log book be taken by defendant Pepper and he replied "you are investigating officers for watching tv and smoking E-cigarettes and other stuff".

(123)   On 12/19/2019 plaintiff was served notice that he was receiving (3) disciplinary charges.   The alleged charges were for alleged violations of rules  **102** planning an escape, **210** possession of anything not authorized for retention or receipt by an inmate or not issued to him or her through regular correctional facility channels, and **360** unlawfully obtaining or seeking to obtain personal information pertaining to an inmate's victim or the victim's family and were all dated 12/17/2019.

(124)   On 12/19/2019 plaintiff received Three separate reports alleging he had violated the charges identified in the last paragraph – (124) – authored by defendants Ng and Pepper. Those Three charges were fabricated to retaliate/punish plaintiff and plaintiff was going to learn that defendants Ng and Pepper used the cell search not only as a platform to punish but a larger purpose of destroying plaintiff's documentary and written and floppy disk evidence/data, was done at the same time.   Before plaintiff can provide this court and jury the facts supporting this allegation of fabricated charges and retaliation and punishment and destruction of evidence, it is first necessary to develop facts that support what the jury will understand; those facts in context with prison regulations and prisoner limited rights  are not common knowledge to everyone, since the jury is comprised of free persons it has no point of reference as to what if any rights or regulations attach to a prisoner in New Jersey.

(125)   On 12/17/2019 plaintiff was required to follow all written and posted rules that are listed in specific detail in N.J.A.C. 10A: chapter 4 and the inmate handbook provided at each prison. Plaintiff   read all rules and regulations and knew what was required of his behavior.

(126)   In prison there are limited rights and privileges and there are exact rules, regulations, policies and procedures established in written documents contained in N.J.A.C. 10A, and Level 1 and Level 3 IMP's developed and approved at NJDOC Central Office APPM Unit.   Once plaintiff is well behaved by compliance with the written regulations he may avail himself of limited rights and privileges which are protected  and may not be  withheld or limited without justification that  the written  rules governing such limited rights and privileges policies and procedures  provide.

(127)   Once a prisoner (plaintiff) who has followed the written regulations finds that he is being treated unfairly and or illegally concerning his clearly established and earned limited rights and privileges he is required to follow specific regulations to file a complaint for redress and resolution and it is illegal to retaliate against plaintiff for filing such formal complaint.

(128) When confined in NJDOC the written rules and regulations restrict a very small amount of written publications from being sent to plaintiff from outside the prison, but there are no rules or regulations that regulate or limit plaintiff from writing to friends and family outside of prison or writing in a diary log book he has in his cell. Plaintiff possesses diary log books of each prison he has spent more than (2) months at. Each diary log book contains specific information concerning his cell and areas of the prison he accesses daily that impact his confinement and memorialize the names of people and times and dates of day to day life in prison especially on days that he has eventful things to record in his diary log books. Each diary log book is bound by staples and consecutively numbered is each page, prior to anything being written on any page; and failing memory makes plaintiff use his diary log books. Each diary log book is self contained with the numbering of each page, and the dating of each entry with drawn lines that separate each entry so that any interloper reading them always knows that plaintiff tells each separate occurrence and each digest within, which establishes context; and those diary log books are at all times lawful to write and possess within a New Jersey prison, as was the case on 12/17/2019 when plaintiff's cell F-128 at Bayside State Prison was the subject of a <u>targeted cell search</u>, done to create a false narrative as a smoke screen to pretend justification of the false charges and to steal intellectual property –(much of which was 76 days of collected evidence concerning BSP), and plaintiff's library of Level 1 and Level 3 IMP's, and other property owned by plaintiff, by the intentional evil acts of defendants Ng and pepper.

(129) Before being served a copy of the aforementioned (3) disciplinary charges in the PHD Unit inside SWSP on 12/19/2019, plaintiff was interviewed by defendants Gardner and Achinko. Plaintiff was called by defendants Achinko and Gardner to an interview room where a digital video recording device recorded the entire interview, that was done on 12/18/2019 inside PHD.

(130) Plaintiff provided defendants Gardner and Achinko his history while at BSP, everything including letters he had written to defendant Gardner, and defendant Grade and defendant DiBenedetti. It was at this interview plaintiff was told for the first time that the (3 page) letter dated 12/3/2019 addressed to SID defendant Gardner was never received by him. Yet at this point plaintiff had no knowledge that those letters sent to defendants Grade and DiBeneditti also were stolen from the mail box on F-Housing Unit.

(131) Plaintiff identified the same dates and times he has written about in this complaint and asked defendants Gardner and Achinko to preserve the Digital security video from 12/16/2019 and 12/17/2019 at Bayside State Prison Housing Unit F and further plaintiff gave times and dates of being interviewed by defendant Alexander and his (100 page) diary log book that was recorded with defendant Pepper and Ng; and plaintiff was assured that an investigation and security video preservation would be done.

(132) At this point plaintiff was starting to draw conclusions about what had made the officers on F Housing Unit to continually refuse to sign the business remit with the certified 12/12/2019 SID letter to defendant Grade and it appeared that the 12/3/2019 handwritten letter to defendant Gardner was stolen and then certain of these defendants watched for when another SID or other letters seeking redress of the crimes at BSP would be sent by plaintiff and the search of cell F-128 and the Three aforementioned

charges were the result of this illegal activity. Plaintiff now had a great deal of out reach to his family and attorneys to do. This Court and jury will see the extraordinary efforts that were done to cement these fabricated charges and run the clock out beyond (30 days) so plaintiff could not get word to officials with the power to preserve the 12/16/2019 and the 12/17/2019 F-Housing Unit security film before it was overwritten or erased.

(133) Plaintiff was very concerned with the location of his diary log book and wanted it produced for his hearing on the fabricated charges he would need to provide for the hearing officer because context would be a key factor to defend against charges alleging planning an escape.

(134) In the state of New Jersey there are laws requiring certain records be preserved. New Jersey State General Records Schedule #G100000-010 (series #21-00-0000) provided to me by defendant Falvey 2/6/2020 under O.P.R.A. records #17541 -(which are possessed by plaintiff)- provide the days or years each record must be retained and when they may be destroyed. The records retention listed for correctional facility security film for Bayside State Prison F Housing Unit was (30 days). The new digital system being used through out NJDOC permitted and permits retention permanently when it serves it's own purposes but for anyone else the retention period was/is only (30 days), unless notice was/is provided for the need to preserve security film beyond (30 days) and that was triggered by providing the dates and approximate times for security film that recorded an incident involving an officer or inmate, but the caveat is that the film recording will only be saved if the notice for preservation is received prior to 30 days from date of incident(s).

(135) Plaintiff sent out about (12) letters to attorney Michael Poreda and Mr. Huebner and ex-wife Elsie Sanchez trying to have the security film of F Housing Unit at BSP preserved for specific dates and times 12/16/2019 and 12/17/2019 that were fortunately successful through documented communications between Elsie Sanchez and defendants Grade and Soltys, Burke and Matthews 1/3/2020 through 1/10/2020; and beyond by plaintiff' friend Mr. Huebner and defendant Soltys on 1/16/2020.

(136) Plaintiff was brought to a room in the PHD on 12/19/2019 where some person named Zimmerman asked plaintiff if he wanted a polygraph and plaintiff was told he would meet with inmate legal assistant David Ribble and prepare the request for polygraph. Plaintiff was returned to his cell in PHD cell 1015.

(137) A digression is needed before continuing. Plaintiff must provide facts of PHD confinement so that the court and jury can have the facts necessary to understand plaintiff's allegations as to PHD.

(138) PHD confinement in NJDOC was allegedly designed for removing disruptive prisoners from general population areas within the prison for periods of confinement, the procedure is very specific and is found in IMP #ADM.019.PHDH.01 revised 4/13/2018 (14 pages).

(139) Plaintiff was placed on PHD and in that status he was permitted access to a pillow, reading materials, legal materials and Jpay player per Sec.V at page (13) of #IMP ADM.019.PHDH.01 however these items were refused when plaintiff requested them, in fact defendant Falvey on 2/6/2020 under O.P.R.A. records #17581 he intentionally altered this IMP to delay/prevent

plaintiff from learning his rights under the most restrictive confinement in all of NJDOC, the portions of IMP he altered by blacking it out are found at page (4) sec. IV. (C)(1) (b)-(e), all of page (7), page (8) sec. (c) and (9), and page (13) sec. V.

(140) Plaintiff was only allowed to write with pen and paper smuggled to him by inmates and an officer or he would have been unable to prepare any written defense to these fabricated charges. All of plaintiff's personal property was withheld and it took over a month to learn that defendants Ng and Pepper took more than his diary log book and thousands of pages of authorized O.P.R.A. records, when he was allowed for the first time to possess any of his property that was possessed by him in cell F-128 in BSP on 12/17/2019.

(141) Plaintiff requested to use the electronic kiosk and phone his attorneys and was told that he would not be allowed access to phone or kiosk while he was still on PHD status and plaintiff asked when that PHD status would be lifted and the answer was that he would be taken off that status on the day of his being found guilty by the hearing officer. As it turned out plaintiff was not released from PHD until (14 days) after the day that the hearing officer defendant DiBenedetto had allegedly rendered a decision on 1/3/2020 but plaintiff was never told he had been found guilty because he was never actually brought to any hearing and on 1/4/2020 he was ordered transferred to New Jersey State Prison (**here after NJSP**) where he was placed into PHD detention in the North Compound Housing Unit 2-B-Right-cell-3.

(142) On 12/19/2019 plaintiff was met at his cell 1015, in PHD where legal assistant David Ribble explained that he would file the request for a polygraph examination and that the hearing officer would be defendant DiBenedetto and would not start the hearing until the request for polygraph examination was answered by the Administrator, defendant Gramp, but that the confrontation examination of defendants Ng and Pepper would be done when they were available. Additionally plaintiff wanted a copy of the documentary evidence being used by defendants Ng and Pepper to support the (3) charges and then he left and when he came back he brought plaintiff some sheets of typing paper and a pen to use to create a list of witnesses, documents and requests for the preparation of his defense. At that time he told plaintiff that the hearing officer would copy all of the documents plaintiff created and provide him a copy and scan a copy into the hearing record file. When plaintiff asked for the documents being used against him assistant Ribble told plaintiff that the hearing officer, defendant DiBenedetto, would allow review of those documents but no copies would be provided and that copies of them would be available through O.P.R.A.. So plaintiff asked when he would be allowed to review those documents and he was told at a latter date. That date never occurred as plaintiff will establish by the facts that follow.

(143) On 12/24/2019 defendant Gramp denied plaintiff's 12/19/2019 First polygraph request and on 12/31/2019 plaintiff was allowed by defendant DiBenedetto to file a second polygraph request after she read the (21 page) 1/21/2019 certified affidavit and (5 page) supplemental certified affidavit dated 12/28/2019, which Mr. Ribble said she took home to read. So plaintiff composed a (9 page) polygraph examination Second request for filing with defendant Gramp and to this point plaintiff had not been brought to start the hearing and again this new polygraph request would delay the start of the hearing as per defendant DiBenedetto.

(144)   On 1/2/2020 assistant Ribble came to plaintiff's cell in PHD and told him that the confrontation portion would happen and that the prepared questions that plaintiff had prepared for confronting defendants Ng and Pepper was being reduced to only a few and when plaintiff asked to speak with the hearing officer, defendant DiBenedetto concerning those questions and he said she -(defendant DiBenedetto)- is already speaking to them -(defendants Ng and Pepper)- and she was not allowing plaintiff to establish his defense. Then plaintiff asked when he was going to be allowed to have the other witnesses and documents produced for when defendant DiBenedetto was going to schedule the hearing and assistant Ribble stated she -(defendant DiBenedetto)- has no intention of allowing you to have witnesses or documents and she had decided not to allow plaintiff to examine the documents provided by defendants Ng and Pepper that they used to support the (3) charges.   Soon after plaintiff was brought to a tiny room and was kept handcuffed with a chain around the waist, so that plaintiff could not even hold and read his questions to defendants Ng and Pepper.   The so called  confrontation portion of the disciplinary Dueprocess procedure was intentionally conducted  to violate  plaintiff's disciplinary hearing  dueprocess rights.

(145)   The so called confrontation portion of the disciplinary hearing process lasted less than (10) minutes and defendant Pepper while not realizing both assistant Ribble and plaintiff could hear him talking to defendant DiBenedetto, and he told her that there was allot more papers he took from plaintiff's cell and he wanted her -(defendant DiBenedetto)- to contact SID.

(146)   After the fraud confrontation portion of the disciplinary process was completed in the (10) minutes it took plaintiff was returned to his cell where assistant Ribble came directly after and asked plaintiff if he was aware of the secret discussions he had overheard between defendants DiBenedetto and Pepper concerning allot of other documents retained by SID, plaintiff and Mr. Ribble discussed what was overheard and then plaintiff asked  him would he testify in court to the illegal portions of hearing he had witnessed and he said he would.

(147)   Plaintiff was then told by Assistant Ribble that there was no decision yet on the Second polygraph examination request and that once it was rendered then plaintiff would be called to the actual hearing and he would be allowed to address the hearing officer defendant DiBenedetto.   But on 1/3/2020 while plaintiff was in the -(once every 3 day)- shower officer Smith came into cell #1015 and stole plaintiff's make shift diary log  -(not yet stapled as a book)- that had been written on the backs of grievance forms, -(because paper supplies were being denied plaintiff sufficient to prepare documents)- and plaintiff yelled for a Sergeant or Lieutenant but the theft was allowed to be covered up.   At that time plaintiff had no idea why officer Smith decided to steal those diary log records but the next morning plaintiff was moved to NJSP and all officers  -(in PHD)- told plaintiff they did not know why he had been transferred from SWSP prior to the hearing completion. Then (10 days) later on 1/14/2020 plaintiff was told that he was being released from PHD restrictions and that defendant DiBenedetto had improperly withheld the hearing decision papers since 1/3/2020 and that was the reason that NJSP had left plaintiff on PHD detention when there was no reason he should have been left on it after arriving at NJSP on 1/4/2020.

(148)   So plaintiff finds out on 1/14/2020 that he was found guilty of 102 and 210 without any hearing and without being allowed to examine or confront the evidence documents.   Defendant DiBenedetto committed fraud and illegally conducted the disciplinary hearing.

(149)  Plaintiff neglected to mention that at the close of 1/2/2020 after being outraged by the fraudulent confrontation of defendants Ng and Pepper and denial of access to the evidence and other conditions of confinement matters, and issues with the hearing process or lack thereof, plaintiff wrote a (19 page) letter/certified affidavit to defendant DiBenedetto that was actually completed in NJSP on the day of transfer thereto 1/4/2020; that affidavit was constructed by plaintiff believing that the transfer to NJSP was temporary since the hearing completion, –(as far as NJSP officials/officers and plaintiff believed)– was still to be completed back at SWSP, and this (19 page) affidavit was made part of the appeal that will be discussed below, that was drafted by NJSP paralegal assistant Marqis Kennon, ID #296957, and refined a bit by plaintiff and retyped by him since plaintiff had no access to any of his property nor his word processor at the time of the construction of the appeal 1/24/2020.  Mr. Kennon did an extraordinary job on that appeal (9 pages), addressed to defendant Gramp as per the required procedure.

(150)  On 2/19/2020 defendant Maines filed a decision, for defendant Gramp, that upheld the decision rendered by defendant DiBenedetto, allegedly on 1/3/2020, which addressed only charge 102 planning an escape with no mention of the other two charges that were  presumably  dismissed.

(151)  At this point 2/19/2020 defendants directly responsible for plaintiff being illegally confined by the fabricated charges of 12/17/2019 to include the constitutionally violative review of polygraphs requests and illegally detaining plaintiff on PHD confinement (10) extra days, and for conditions of confinement issues and all matters connected, will be named with proper connections to facts and each other further on in this complaint.

(152)  While confined at NJSP on PHD status plaintiff was denied all access to all personal property and use of phone, kiosk, hair cuts, Lexis Nexis computer access, reading books and legal books, attorney phone access and kosher diet and shaving, all without lawful purpose and directly against the regulations policy and procedures for disciplinary confinement and PHD confinement and were intentionally done as a pattern and practice to punish.

(153)  At this point it is important to remind the court and jury that plaintiff made the required inquiry and grievance complaints and additional complaints made for him by Mr. Huebner and ex-wife Elsie Sanchez, to address each individual matter that is imputed to any and all of these defendants as violating a New Jersey statute, New Jersey Constitution, United States Constitution Amendment; in short all administrative remedies and appeals required by NJDOC regulation, policy and procedure has been complied with by plaintiff, which applies to each allegation made within the Four corners of this complaint and there is a document or security film plaintiff will produce at trial for each and every fact he alleges herein, so that the court and jury will not have to rest on simply those allegations made by this plaintiff.  Documents and security film already possessed by defendants.

(154)  Additionally it should be noted here that there is this set of operating instructions for every area of the prison called post orders and log books and they cannot be destroyed or lost without accountability and if any log or post order becomes missing this plaintiff knows how to identify the persons who would have done such an activity which would be spoliation. This plaintiff will expose all spoliation aggressively  in addition to what defendant pepper has done, should any other defendant choose that path.

(155)  The determination of guilt by defendant DiBenedetto for charge
102 (planning an escape) was allegedly based upon (16 pages) of documents
that defendants Ng and Pepper removed from plaintiff's cell F-128 at Bayside
State Prison on 12/17/2019, these (16 pages) were marked **A6-1 - A6-16**.
Plaintiff was never allowed to examine them but assistant David Ribble said
he had caught sight of them when defendant DiBenedetto was going over the
hearing record, and he gave plaintiff an idea of what they appeared to be,
and as soon as plaintiff was told this he asked if the yellow diary log book
was in the file and was informed by assistant Ribble, that there was only
the (16 pages) that were copies of hand writing on lined paper 8½ x 11 in
size but no 8½ x 14 lined yellow pages stapled at the top.  Plaintiff filed
a request for O.P.R.A. records of the disciplinary file and the disciplinary
decision of defendant DiBenedetto dated 1/3/2020, and defendant Falvey sent
that O.P.R.A. request under tracking #17503 on 1/16/2020 documents of the
hearing record to include (16 pages) marked **A6-1 - A6-16** that were redacted
to prevent plaintiff from filing an administrative appeal and to prevent
plaintiff from filing a meaningful challenge of the fabricated charges filed
by defendants Ng and Pepper 12/17/2019.  This is important because the hearing
officer defendant DiBenedetto did **not** mark any of the evidence or testimony
under the sections of the disciplinary documents that allow for preventing
such evidence from disclosure, there was no legal reason to hide documents
which were taken from plaintiff's cell as all the evidence used against him.

(156)  Even though defendant Falvey was obstructing plaintiff from review
of the evidence pages **A6-1 - A6-16** by blacking out most of them plaintiff
was still able to conduct forensic measurements of the lines and determined
that the (16 pages) had been cropped intentionally by copying and re copying
so that certain of the pages would loose their true original construct; which
was **spoliation** of the diary log book <u>evidence</u>.  Plaintiff will revisit this
further on in this complaint, first other facts need to be stated at this
point in this complaint. Question: after altering the copies where is
original diary log book?

(157)  At trial plaintiff will produce for the court and jury documents
that are produced by certain of these defendants or maintained by certain
of these defendants that are used to provide to the public and courts the
<u>appearance</u> that <u>complaints</u> made by plaintiff specifically and other prisoners,
are addressed, while the actual use of the Inmate Remedy System has **devolved**
to a **pattern** and **practice** that defendants use to obfuscate and obstruct
procedural and substantive Due Process of Law with the intent that plaintiff's
rights and privileges, that are allowed him as a convicted prisoner, may
be taken, abridged and prevented at the whim and caprice and in arbitrary
fashion by these defendants,  and the Inmate Remedy System is being used/has
been used to provide a smoke screen where complaints  plaintiff will prove
at trial, that he made, that implicated state and federal rights,  were valid
and intentionally kept **spinning** in circular manner so that no matter the
complaint made by plaintiff no resolution whatsoever would be had, and that
pattern  and practice forced plaintiff to find a way to expose this pattern
and practice; which he has done, as facts establish below.

(158)  Plaintiff has come to learn by documents produced by defendants
that the Inmate Remedy System has simultaneously also devolved in/to its's
now **perverted** use, where it has been designed by defendants - (who are
attorneys, Hicks, Burke and Falvey to name a few) - to insulate, where ever

possible, each of the defendants from being directly placed on notice, of any complaint made, so that they can pretend qualified immunity of direct or supervisor liability; so they operate as does organized crime families do in R.I.C.O. cases, where they never have direct knowledge of the complaint or by rote designate to other persons the pretended pro forma complaint resolution process, whereby no NJDOC employee knows anything.

(159) NJDOC IMP #ITT.001.OIT.001 titled (DOCNet Procedures/Users'/Manual) revised 3/22/2019 (33 pages), is the NJDOC standards and procedure for the use of information technology and at pages 14-16 are the instructions for NJDOC use of E-mail. And the April 2019 edition of the NJDOC Telephone Directory provides the correct E-mail address for all defendants. Plaintiff and New York friends Mr. Huebner and Mr. Lynch and plaintiff's ex-wife Elsie Sanchez were provided by plaintiff the procedures for sending defendants E-mails.

(160) On January 30, 2020 Elsie Sanchez sent an E-mail structured like this (sample: Marcus.Hicks@doc.nj.gov). Plaintiff had her send the following defendants the E-mail: Bonds, Hicks, Gramp, Davis, Richards, Grade, Soltys, DiBenedetti, Gangi, Smith, Blakeslee, Matthews, Maines, Stigliano, Ganesh, Falvey, Burke, Sargenti, Gardner, Haley, Cope, Ricci, Lawrence, Norris, Achinko, Vaught, Emirch, Hampton, Mcduffie, Stem, Crothers, and Mainstream. with (2 page) cover letter that identified crimes committed against plaintiff and indicating that there were (14 separate) attachments that provided each defendant above named a copy of plaintiff's 12/21/2019 (21 page) certified defense affidavit, 12/28/2019 (5 page) supplemental certified affidavit, 12/27/2019 (3 page) letter to Elsie Sanchez, (9 page) Second polygraph examination request dated 12/31/2019, (19 page) certified affidavit dated 1/2/2020 to hearing officer (defendant) [DiBenedetti] regarding pre-hearing irregularities, (12 page) letter to Elsie Sanchez dated 1/4/2020, (2 page) hearing officer (defendant) DiBenedetto disciplinary decision typed dated 1/3/2020, (11 pages) of hearing record without any documentary evidence and (25 page) letter to Elsie Sanchez dated 1/12/2020, all these were sent in scanned increments totaling the Fourteen attachments to said E-mail and collectively these documents provided extremely detailed facts and evidence that listed names, security film, SID investigators, dates and places which provided the defendants listed, a clear mandate, a clear duty to investigate and or cause to be investigated the Federal Constitutional, and state of New Jersey Constitutional and Regulitory violative crimes against plaintiff: each of these documents provided each of these defendants actual direct complete knowledge of plaintiffs complaints, that are the same complaints made in this civil rights complaint, but these defendants took no action and rather than take action to resolve or investigate the matters placed upon their NJDOC E-mail's they pretended nothing to see, nothing to do and thereafter attempted to cover up the complaints made by this plaintiff and or encourage others to refrain from investigating or resolving the matters provided to their knowledge. They were deliberately indifferent.

(161) The same E-mail discussed in paragraph (160) above was re-sent on 2/23/2020, with nothing done and no response.

(162) The same E-mail discussed in paragraph (160) above was resent to defendants on 6/26/2020 and again no response and nothing done.

(163) On 6/19/2020 about (1670 pages) of some of the IMP's stolen from cell F-128 at BSP on 12/17/2019 by defendants Ng & Pepper, were brought to plaintiff's cell in NJSP.

(164)   A digression is necessary here as plaintiff forgot to mention above in paragraph (115) that his cell had been routinely searched approximately a week prior to the 12/17/2019 targeted cell search and proof of that fact can be found in the F-Housing Unit cell search cloth bound consecutively numbered log book that records each cell search.

(165)   Plaintiff now gets back to the 6/19/2020 return of approximately (1670) pages of O.P.R.A. records at cell #57 in the West Compound 2-Right Housing Unit, by Senior Corrections Officer Francis indicated that he had been ordered by package room to bring the box (a Mason copy paper box) to plaintiff.

(166)   Plaintiff immediately started an exact cataloging of each document returned that day that had been lawfully possessed in his cell F-128 inside BSP on 12/17/2019, and these efforts were completed on 6/25/2020.  Plaintiff then sent a copy of this (typed 9 page) list of the returned (1670 pages) of documents to Elsie Sanchez for her to then scan that list and send it as an attachment to a (1) page E-mail to each of the defendants listed above in paragraph (160), and on August 7, 2020 Elsie Sanchez sent each of those named defendants a copy of that (9 page) list of the returned documents.

(167)   It should be noted at this point that plaintiff has direct knowledge that defendants were served the documents identified above in this complaint at paragraphs (160) and (166) because Elsie Sanchez sent plaintiff copies from her computer that show the successful transmission and reception of all such E-mails with the exact times and dates sent and received, and these are going to be produced for the court and jury at trial as will all the other documents plaintiff has that support every fact he claims in this complaint.

(168)   In addition to plaintiff merely constructing that (9 page) 6/19/2020 - 6/25/2020 list it was also very important to this complaint in that certain of those documents that were returned were the very same that had been used to fabricate (2) of the (16 pages) of alleged evidence that defendants Ng and Pepper attached to their (3) misbehavior reports of 12/17/2019. which will be discussed below in this complaint.

(169)   Moving forward ahead of other matters needed to be addressed, but necessary to be addressed now, is the moment when plaintiff was provided all (16 pages) of the documents A6-1 - A6-16 that were **un-redacted**, which came on 8/25/2020 from his attorney Michael Poreda.  Upon review for the first time these un-redacted copies, plaintiff had conclusive proof that not only were there altered pages but the same pages copied twice, which will be developed extensively below.

(170)   At the time of drafting this part of this complaint, 4/21/2021, plaintiff is still waiting for the decision of the New Jersey Superior Court Appellate Division, in RE: Darius Gittens V. New Jersey Department of Corrections Docket #A-3008-19 that currently has been fully submitted which seeks to reverse the illegal decision of defendant DiBenedetto rendered allegedly rendered 1/3/2020. This is necessary to mention here because within the filings by plaintiff's attorney, Michael Poreda, in that matter, is an (18 page) certified affidavit dated 8/26/2020 which was to support a motion made by Esq. Poreda for settling the record and supplementation of the record of the disciplinary hearing on appeal, and plaintiff constructed

an extensive forensic dissertation on each of the aforementioned documents
A6-1 - A6-16 found at (pages 10 - 12) and  (pages 14 - 18) which plaintiff
will again recount as it is necessary for this court and jury see these facts
framed in this complaint to fully comprehend the extraordinary fraud that
defendants Ng and Pepper presented to defendant DiBenedetto, which is
foundational to plaintiff's claims against all of these defendants where
none of them investigated anything but through silence and obfuscation and
or out right obstruction caused and or allowed illegal fabrication of charges,
spoliation of key evidence, and  refusal to allow review of evidence alleged
to support the Three charges and  refusal to conduct  meaningful review of
polygraph requests and  fraudulent disciplinary decision appeal review.

(171) Defendant DiBenedetto prevented plaintiff all access to evidence
documents she marked A6-1 - A6-16 which prevented plaintiff from providing
context and facts she would be required to investigate prior to rendering
any decision and plaintiff will now provide the facts below and it is
plaintiff's intention, in providing them, that the court and jury view this
presentation not only as impacting the hearing itself but also the entire
construct of the fabrication of false charges combined with the immediate
evil and criminal destruction of the very evidence comprising the fabricated
charges done to prevent plaintiff and defendants from review and investigation
of the actual unaltered diary log book.

(172) Please keep in mind that those (16) pages were marked by defendant
DiBenedetto A6-1 - A6-16 that was clearly random and without regard to any
mind set seemingly without a thought as to the same document being repeated
nor presented with any mind set towards context; plaintiff now provides this
court and jury the facts each document presents that he was intentionally
prevented from doing by defendant DiBenedetto prior to her decision made
without allowing plaintiff to attend a hearing upon which that decision was
allegedly predicated upon.

(173) A6-1: This page from the missing diary log book dated 10/17/2019,
it was written after plaintiff had been moved to Trailer 2 complex for (2)
days. - (please note: defendants have a document they create as a normal
operating function of tracking inmates within NJDOC called ("Inmate Management
Progress Notes Report").  The court can take judicial notice and use this
document from plaintiff's classification folder to track each housing
location, and each date plaintiff arrives and leaves each cell or bed
location) -  and this page is part of (3) more pages that described the
entire Trailer 2 complex, the lighting, rotted flooring, emergency exits
bolted so that in an emergency fire the push bar at each emergency exit was
only a prop because each door has (2) double sided (keys on both sides),
clogged air filters so that the (7) (Five ton package air conditioners were
on without air blowing), etc., this page concerned the condition of
confinement that existed in Trailer 2 complex, and the bottom (9) lines have
been copied and cropped and copied again to hide the context that was written,
that would show that the diary log book was a digest of the various areas
that impacted plaintiff's day to day conditions of confinement.  And the
removal of the bottom was to hide the fact that this page was **numbered** at
bottom consecutively.

(174) A6-2: This document causes plaintiff to open his South Woods
State Prison diary log book where at (page 176) the date 3/7/2018.  On this
date there was flooding coming from a higher cell somewhere, but during the
cleanup the pipe chase next to plaintiff's cell 1-H2-1R-1042 was left open

to dry out and when plaintiff looked into that opened pipe chase (water closet) he saw that there was an aluminum building tag about 4 X 4 inches that provided the exact (modular building) construction data as follows: **"South Woods State Prison facility 1, 2 building housing unit 2-1 Right, constructed by N.T.A. Inc. on 11/29/1995. cell type C469-155. (NTA Modular Building Construction) Serial #A-13-155, Seal F2-66820, Serial inspection #04001172 Building Commission"**. Plaintiff was writing books on every type of condition of confinement at all New Jersey prisons, and this prison South Woods State Prison was/is a **modular** prison.  So on 3/7/2018 plaintiff wrote down the specifications mentioned above and he wrote concerning flooding and the modular nature of the prison he was in.  Additionally, plaintiff wrote a series of loosely drawn diagrams, this **A6-2** document was One of them. The dimensions of the cells in South Woods State Prison are 148 X 78 inches and this Court and jury will see later when plaintiff digests (**A6-5** and **A6-16**) it will become immediately apparent that those dimensions are for South Woods State Prison.  First of all there are no cells in Bayside State Prison with these sizes, the cells in Bayside State Prison are approximately 120 inches X 78 inches, and the bed height from floor to top bunk is (48) inches. Not (57) inches. Additionally, there are no seats or shelves in Bayside State Prison cells.  Also there are no lines in this hand written document (diagram) and plaintiff wrote exclusively on yellow lined paper (8 ½ X 14) while he was in Bayside State Prison.  Please note that in 2018 while still in South Woods State Prison plaintiff filed an O.P.R.A. records request seeking the business records concerning the same exact modular building company corresponding to this same company identified herein as listed on page (176) of his South Woods State Prison diary log book and both the diary log book and the (O.P.R.A. records request and response by  defendant Falvey will be introducedto the court and jury at trial.

(175)   **A6-3:** This page from the missing diary log book was partially written to address plaintiff's disability that makes it very difficult and painful to climb any stairs, and there are only (24) lines, with (14) lines missing,  that  explained  conditions  of  confinement;  and  the  page  is intentionally copied then cropped and re-copied.  And the page and date has been removed to hide the fact that this page was written within the First week plaintiff was in Bayside State Prison and prior to moving from cell B-143 on 10/15/2019. Clearly this is against the false narrative of defendant pepper's charge 102 misbehavior report dated 12/17/2019  and his preliminary Incident Report drafted on Form #CUS-101 dated 12/17/2019 at 20:00:00 hours (military time written on the report) where he states that plaintiff had **"detailed maps of F-Unit and detailed maps of cells within F-Unit"**.


(176)   **A6-4:** This document is a page copied from O.P.R.A. record #16358 that was recorded on security film of officer desk area 12/17/2019 being read by defendants Ng, Togno and Pepper at F Housing Unit officer desk area. This was copied from said O.P.R.A. record #16358 that plaintiff currently possesses because that entire document that consists of the  compilation of New Jersey State Employees official names, titles and salaries for (4) prison NJSP, EJSP, BSP and CRAF.  This document was stapled at the top with brief staples (the same construction –(as the 100 page subject diary log book)- and it had/has a total of (96 pages), and this document was the same one identified in the (9 page) 6/19/2020 – 6/25/2020 document referenced in this complaint at paragraphs 163, 165, 166, 167 and 168 supra.  This document was at all times authorized  (O.P.R.A. record #16358) and it too

was fully digested in said E-mail -(see paragraph 166 supra)- Elsie Sanchez
sent to named defendants, and the purpose of it's use to plaintiff is the
same as he used it for this complaint, to properly identify each officer
or employee that he was writing about, so proper full name can be used in
civil rights litigation and writing books on prison life and conditions
of confinement as also was the case for creation and use of the diary log
book. Both this document and the diary log book were both recorded at the
officer desk in F housing unit on 12/17/2019 being read by defendants Ng
and Pepper, as well as other officers who all kept looking back towards where
plaintiff was ordered to sit, and there was anger in their faces because
they saw that plaintiff had written about officers illegal behavior.

(177)  **A6-5:** This document again having **nothing** to do with Bayside State
Prison, was/is the dimensions of the yard in South Woods State Prison. Every
employee in BSP knows that there are **no** double door lockers, nor are there
any (9) sided yards, nor hand ball courts, nor 132 foot demising wall (12)
feet high, nor any day rooms. This document was kept -(along with all loose
un-lined pages, of which there was/are about 9)- in a manila envelope marked
"psychological factors in cell design and yard design at South Woods State
Prison, for use in court cases and writing books".

(178)  **A6-6:** This document was taken from the last page of the NJDOC
April 2019 telephone Directory, authorized by O.P.R.A. record #16896 on
7/11/2019 by defendant Falvey.  Defendant Pepper ripped it from that phone
directory, it was page #91, and defendant Pepper pretended that it was found
as a loose page and that it was part of an escape plan plaintiff was involved
with inside BSP Housing Unit-F, when clearly it is a map of the NJDOC Central
Office which when that telephone Directory is opened to page (61) the reader
sees a list of all NJDOC "Correctional Facilities" addresses and the distance
in miles each facility is from NJDOC Central Office and it shows that BSP
is (88) miles from NJDOC Central Office.  All these defendants pretended
not to notice the utter fraud being committed by defendant Pepper when he
ripped out that page an attached it to the other (15) pages, pretending it
was used in an escape plan.  This document was returned to plaintiff amongst
the (1670) pages of O.P.R.A. records returned to plaintiff on 6/19/2020 and
it is identified as being returned at page (9) (line 16) of paragraph (32)
of the (9) page E-mail identified in paragraph (167) of **this** complaint.
Plaintiff possesses this document page (91) and the rest of the Phone
Directory (90) pages for the court and jury at trial.

(179)  **A6-7:** This page from the missing diary log book dated 10/6/2019
and clearly marked at bottom of page in the center, page (12); this page
a diagram memorializing the prison plaintiff was continuing to write about
in that diary log book for use in civil rights litigation in court and books
being constructed on BSP prison conditions and prison life.  Plaintiff had
been in this cell located in Housing Unit-B for (4 days).  The **context** leading
up to this loosely drawn diagram preceding this page (12) was intentionally
destroyed - (spoliation) - by defendant Pepper and had only (35) lines,
meaning the top (3) lines of text were copied cropped and re-copied.  These
defendants all have pretended that there is nothing to see no awful stink
just silence against the back drop of certified complaints and security
video and SID recorded interview evidence; the stink of corruption in
plaintiff's case here before this court and jury reeks as a festering pustule.

(180)  **A6-8:** This page from the missing diary log book was written on or about 10/17/2019 (2) days after plaintiff had been moved from Housing Unit-B to Trailer 2 Housing Unit, bed A-8-down -(or bottom)- Bunk bed (which had normal <u>Forty inches head</u> clearance. This was page (48) of the now missing diary log book which can be seen at center bottom.  This page (48)  is memorialization of illegally locked exit fire doors, and illegal stolen - (pirated)- Direct cable tv programming by BSP officers by their use of hidden flat screen tv that was hidden in a dark blue (2) door wheeled wooden cabinet that had a pad lock hasp with pad lock that were used when certain officials made inspections.  This page (48) shows the reader the primer to use in establishing when plaintiff had moved from Housing Unit B, within the context of when plaintiff made each entry into that missing diary log book. It cannot be lost on the reader <u>no A6-1 - A6-16 document was created in cell F-128.</u>

(181)  **A6-9:** This page from the missing diary log book has (4) lines missing from the top that have been copied cropped and re-copied . It is clearly page (19) and that is seen at bottom and at center of the page, it was drawn while plaintiff was housed in Housing Unit-B in cell #143.  Again it was made to memorialize the environment plaintiff was experiencing, and it is clearly marked B-Unit.

(182)  **A6-10:** This page from the missing diary log book is the copy of A6-8 as discussed in paragraph (180) of this complaint, that defendant Pepper used to bolster the fabricated charges and false narrative fostered by the intentional deceit and fabricated reports by defendant Pepper 12/17/2019.

(183)  **A6-11:** This page from the missing diary log book upon careful inspection we see that at bottom center is the page number, (page 3), which means that it was composed on or about 10/4/2019 in Housing Unit-B.  However, the reader wants to look carefully at the bottom of this copy of plaintiff's diary log book to see that the many pages are visible and the pen with string can be seen and on the right side about (5) inches from bottom of the page we see there is a piece of page sticking out and then look to the very top and if the reader inverts the page there then becomes visible a preceding page that has been folded back which would be page (2) and it reads "<u>and will have Levi help</u>".   That would be plaintiff's attorney Levi Huebner. The point of this forensic examination being imparted to you the reader is that this A6-11 document shows that this was the diary log book before defendant Pepper ripped out the other pages for copying and before he stole and or destroyed that diary log book.  Again the reader should remember that this was composed in B-Housing Unit which continues to expose defendant Pepper's false narrative he wrote 12/17/2019 where he claimed that these documents were composed in F-Housing Unit for the purposes of planning an escape from Housing Unit-F.

(184)  **A6-12:** This page from the missing diary log book is the same copy of A6-10 located at paragraph (182) supra.  It is more of the same bolstering to create the false narrative by defendant Pepper.

(185)  **A6-13:** This page from the missing diary log book had the top page intentionally ripped off and is dated 11/2/2019 and is marked page (41) at center bottom and was written when plaintiff was in Trailer 2 complex Housing Unit.  Plaintiff made notation concerning kosher peanut butter memorializing the inquiry #BSP19025802 filed 10/25/2019 and memorializing Officer Peter J. Nolan advising Trailer 2 prisoners that Administrator Gramp

was making rounds inspecting the Unit and plaintiff memorialized the illegal behavior of officer hiding the illegal flat screen tv hidden inside the blue wooden cabinet and cancellation of recreation due to a power outage which was told to prisoners on the loud speaker, which told the inmates there was a code 22 being called –(code 22 requires prisoners to stand for a count with ID in hand). This document was used by defendant pepper in his reports of 12/17/2019, where he pretended that plaintiff, by implication was planning an escape because he had written about the stand up count that occurred in Trailer 2 by writing in his preliminary incident report and misbehavior report: **"when stand up counts were called"**. Every NJDOC employee and prisoner knows that there is no secret to stand up counts because they are spoken of over the loud speakers at every facility giving everyone notice that inmates must produce an ID and be standing for a count. The rarity of stand up counts has no security value that can be exploited. Plaintiff merely memorialized that one, the only one called while he was at BSP.

(186)   **A6-14:** This page from the missing diary log book dated at the top 10/7/2019 with the time 6;00 A.M. memorializes that plaintiff still had no pillow –(pillows are required to be provided)- also memorialized illegal asbestos pipe chase stickers warning of X-119 insulation, and next plaintiff memorialized that he was creating a record of each time he was allowed out of his cell, the bottom has been intentionally ripped off. Plaintiff knows the torn bottom is intentional because that diary log book was bound on top, for the bottom to be torn cannot have been accidental in fact plaintiff digresses here since the diary log book was destroyed, ripped and all such tears and removed pages where defendant Pepper tampered with that diary log book a violates many criminal statutes in New Jersey – (plaintiff will provide a recitation in this complaint below of these crimes). It is illegal to force inmates to eat their food within 4-8 minutes of being provided the food, the minimum is (15) minutes which was part of the reason the times out of cell, for obtaining food, were being limited; everything plaintiff wrote in his now missing –(stolen)- diary log book concerned memorializing his conditions of confinement.

(187)   **A6-15:** This page from the missing diary log book is a copy of **A6-2** addressed in paragraph (174) supra. Again we see defendant Pepper bolstering the fabricated documentary alleged evidence, why would an honest person try to trick reviewing officials who have no time or will to examine each page of the alleged evidence by salting the documentary record with intentional misrepresentation of the objective true record and why destroy and alter documents as he was seen on the preserved security film from 12/17/2019 in possession of before he altered and destroyed them?

(188)   **A6-16:** this document is a copy of **A6-5** located in paragraph (177) supra, which plaintiff already provided the court and jury a digest thereof. Again we find defendant Pepper trying to fool everyone by his fraudulent use of bolstered documents why would he do that? and why has he destroyed documents, altered documents and intentionally copied the same documents that only conflates the alleged hearing record?

(189)   At this point plaintiff should mention that all pages of the diary log book that defendant Pepper stole and altered was composed of standard commissary lined yellow (50) Page tablets sold under item **80033** and each page has light blue lines and each page has (38) lines. So when plaintiff provides this information about missing lines it is to show the standard.

(190)   Plaintiff has taken time and given a great deal of thought to presenting this court and jury finite factual details concerning these aforementioned (16) pages of alleged evidence that defendants Ng and Pepper presented with their charging documents, and plaintiff has provided these details because they **would** have been the same presented to the hearing officer, defendant DiBenedetto at a hearing.  Unfortunately this plaintiff was not allowed to examine those documents A6-1 - A6-16 prior to defendant DiBenedetto rendering her alleged 1/3/2020 decision; and once discovery is conducted this court and jury will come to learn that plaintiff was not allowed the opportunity - (actually a well settled right that was denied without justification) - to attend an actual hearing, and to comment on evidence being considered against plaintiff, and to call witnesses that were not a threat to the good an orderly hearing process or duplicative,  and the right to present documentary evidence, and the right to call as a witness SID Investigators to present direct testimony of their review of F Housing Unit security recordings that captured defendant Pepper in possession of a complete (100 page) diary log book, where defendant Pepper at confrontation, of One of the only (3) questions allowed plaintiff,  told the hearing officer (defendant DiBenedetto) that he never had any (100) page diary log book but located some loose pages inside plaintiff's cell.  The security film from 12/17/2019 at 7:55 P.M. through to about 8:18 P.M. shows him in possession of that (100) page diary log book from Two separate camera positions that cover the officer desk area.

(191)   On 1/17/2020 plaintiff was ordered out of his cell in disciplinary confinement (cell 2-B-Right) where he was provided (5) boxes of legal documents and some books.  Plaintiff immediately told the officer that there all personal property possessed inside his cell F-128 at BSP on 12/17/2019 was missing and after hours of searching through 30,000 pages of various civil and criminal law work a further discovery  was apparent and that was that all plaintiff's records, floppy disks, files about BSP had been surgically removed except for (1) floppy disk plaintiff had hidden in a Lexis Nexis instruction manual, that floppy disk was a secret back up plaintiff had used to back up some of the letters he sent complaining about NSP and BSP that was missed.  Plaintiff learned that at BSP only officers are allowed to possess an inmate's property that is being packed when that inmate is locked up and shipped out and plaintiff was informed in writing that defendant Ng was the officer recorded on F-Housing Unit security film removing property from cell F-128 and bringing it up to officer area for processing to the property room and it was defendant Ng that stole the bulk of all of plaintiff's personal and intellectual property amounting to a loss of about $1,395.00. That figure also included replacement parts for plaintiff's Brother EM-630 Word Processor that had parts ripped off and stolen in an attempt to obstruct plaintiff from access to use it.

(192)   On March 1, 2020 plaintiff wrote a (4 page) letter to Lee C.Seglem, Executive Director, State of New Jersey Commission of Investigation. The Commission of Investigation (hereinafter NJCI)  is an independent  agency. NJCI has a statutory mandate under NJSA 52:9M-8 (a) whenever they receive a complaint of crimes committed by public officers that are employed by the State of New Jersey, a preliminary  investigation must be conducted and if it appears that such officer or officers may have committed crimes while involving their state employment, the commission is required to provide notice to the Attorney General. The letter plaintiff sent listed (7) individual crimes and (1) violation of regulitory law as discussed below.

(193)  These are the criminal statutes and regulitory law that plaintiff addressed in his March, 2020  letter to Mr. Seglem at NJCI: 2C:20-8 (b) theft of services,  2C:20-8 (e,), theft of cable services, 2C:20-25 (a) theft of computer storage medium, 2C:28-6 tampering with or fabricating physical evidence, 2C:28-7 (a) (1) (2) and (3) tampering with public records, 2C:30-2 (a) official misconduct, and 2C:30-7 Crime of pattern of official misconduct and N.J.A.C. 10A:2-3.2 (d) stealing services paid for by inmate welfare fund. Each of these statutes above listed were alleged by plaintiff to be violated by Senior  Correction Police Officers and Sergeants at BSP and he provided sufficient background information and asked that Mr. Seglem provide plaintiff with an E-mail address so that ex-wife Elsie Sanchez could E-mail his office the same E-mail that was sent to the above defendants as discussed in paragraph (160) supra, which would have provided him the complete facts of the crimes plaintiff was alleging that were committed against him in BSP, but Mr. Seglem never wrote a reply.  So plaintiff re-sent that March 1, 2020 letter (3) more times and never a response.  So plaintiff had his friends Mr. Lynch and Mr. Huebner contact NJCI to find out why Mr. Seglem did not respond and they were informed that Mr. Seglem was replaced by Mr. Chadd W. Lackey as the new Executive Director of NJCI.  Thereafter, Mr. Lackey was mailed a Fed Ex package since he refused to provide an E-mail address. That Fed Ex package contained a print out of the (2) page E-mail with the (14) attachments described in paragraph (160) supra; the package addressed to Mr. Lackey was responded to by him on 7/29/2020.

(194)  When Mr. Lackey sent plaintiff  his letter dated 7/29/2020 he stated that he received the March 2020 letter with no discussion of the evidence he was sent via Fed Ex, that was tracked by Mr. Lynch and determined to have been received by Mr. Lackey.  In sum he stated in his letter that he determined that "your complaint" is outside the jurisdiction of the Commission.  Plaintiff as soon as he read that Knew  Mr. Lackey,  who is an attorney, was being disingenuous;  Jurisdiction is NJSA 52:9M 8(a).

(195)  Plaintiff then  wrote Mr. Chadd  W. Lackey  a letter (5 pages) dated 8/20/2020, and provided compelling legal reasons why his office is required to conduct a preliminary investigation, requiring him to contact the New Jersey Office of the Attorney General.  Plaintiff mailed that letter and then Mr. Lackey refused to reply to it.  Mr. Lackey was required to investigate, and if not for the fact that plaintiff is a prisoner such investigation would have been done and or the Attorney General would have conducted an investigation based on the certifications plaintiff provided and the overwhelming evidence provided by plaintiff, yet nothing but silence. This is deliberate indifference to plaintiff's constitutional rights being violated by New Jersey public officers.  Therefore Mr. Lackey has been added to this complaint as a defendant as a direct response to his intentional refusal to aid in preventing continued illegal retaliation against plaintiff and the theft of First Amendment intellectual property by such public officers who tampered with evidence as part of a conspiracy; all of which was very well laid out by plaintiff's certifications that explained the crimes committed by public officers, that provided defendant Lackey direct notice.

(196)  NJDOC has authorized defendant Falvey to provide O.P.R.A. records to plaintiff that certain of these defendants have decided to steal from plaintiff, without the established policies and have created their own illegal policies and practices.

secreted a (22) page O.P.R.A. record #17734 -(which comprised NJSP employee list)- authorized by defendant Falvey. Plaintiff had watched that officer leave his cell and both the security camera and plaintiff saw that officer Kovacs had nothing in his hands. When plaintiff returned to his cell he immediately realized that the aforementioned O.P.R.A. #17734, was gone. Therefore, plaintiff yelled out of his cell for officer Kovacs to immediately come back and explain the theft. Officer Kovacs is recorded on the security film coming back, and plaintiff asked him to return the stolen records; and he replied "your not allowed to have those records" and plaintiff stated "I have the authorization from NJDOC records custodian Falvey right here" and Kovacs demanded plaintiff let him read it. Kovacs upon being handed the authorization #17734 read it then turned and walked away. Later he came back to plaintiff's cell and handed over a confiscation receipt -(form #171-1 that had (6) sections with a box in each section to check the reasons for confiscation)- and none of the boxes were checked, that could be argued as the officer's purported reasoning for that confiscation; nor a reason for putting it into his pocket. Plaintiff asked him who authorized him so confiscate the O.P.R.A. records and his answer was " the area Sergeant, the Lieutenant and Major Sears).

(198) NJDOC employees are required by the procedures in place that are required by N.J.A.C. 10A:18 sub chapter **2.15 (b)** and **2.17 (a)** 1-5, I, **II, and** III (Disapproved Correspondence), when they confiscate documents.

(199) Plaintiff immediately wrote letters, and filed on the electronic kiosk inquiries and grievances complaining to the following defendants that his O.P.R.A. record #17734 had been stolen; but all post confiscation Due Process of law had been withheld from plaintiff and each of them pretended the that the other was reviewing those documents, and continued to deny plaintiff all access to them or any Due Process after plaintiff appealed these violations of plaintiff's procedural and substantive Due Process of law rights. These documents O.P.R.A. record # 17734 was never returned.

(200) the **defendants** who had direct knowledge of the illegal withholding of all Due Process from 4/10/2020 through this date in constructing this complaint 4/24/2021, over a full year, -(that plaintiff has fully documented and possesses **each** grievance and inquiry and letter copy, for presentation to the court and jury as evidence against each of them)- their names are as follows: Kemble, Sears, Gadecki, Emrich, and Richards.

(201) Prisoners do not have a Federal Constitutional Right to claim damages for the failure of prison administrators to properly investigate wrong or illegal actions done by New Jersey State employees. However, Plaintiff will produce evidence at trial for the judge and jury, that will demonstrate that the withholding of an investigation and or withholding of evidence by corrections staff and SID investigators, where such evidence clearly supports by clear and convincing or preponderance of evidence, that suggests that the failure to investigate was for the purpose of a pattern and practice and or secret policy and or conspiracy to hide, obstruct, destroy or taint evidence, that was designed to or resulted in First Amendment Rights to petition for redress of illegal and or constitutionally violative conditions of confinement within a prison, then to that extent, with the proper qualifiers, plaintiff intends to prove as part of his complaint,

that failure in this case, to investigate may, rise to an actionable claim for the purposes of this complaint, under the very specific facts in support of proof that the Constitutional Rights of plaintiff that were shown to be extant and by their deliberate indifferance were successfully extended and consequently, plaintiff's damages were proportional to that failure to investigate, and it is plaintiff's intention in the next paragraph to provide a digest of NJDOC IMP's and  other instructive materials to establish **facts** that will show this court and jury investigative tools available to SID investigators so that we can have a yardstick or primer upon which to measure what should have been done and was not done of the required regulations and procedures and policies for investigations of mistreatment and conditions of confinement that are clearly illegal and violative of plaintiff's constitutionally protected rights.

(202)  Plaintiff has some facts raised in this complaint that may well be viewed as minor, standing by them selves, however, these defendants by their own pattern and practice have taken all complaints resolution and refused to comply with any of their own rules and regulations even after this plaintiff utilized the Inmate Remedy System and written addendums to those complaints filed on the electronic kiosk system provided for Inmate Remedy System Inquiry and Grievance filings.  Plaintiff has filed proper and timely complaints on the kiosk as inquiries and grievances and no problem resolution ever occurs; each of the below listed kiosk complaint numbers are identified by number, date and issue complained about so that this court and jury has facts that show how plaintiff had utilized the system and facts that show how certain of these defendants intentionally did nothing to resolve any problem and only responded to plaintiff to pretend involvement in prisoner problem resolution, while resolving nothing and assisting each other as a conspiracy to obstruct plaintiff from protecting his First and Fourteenth Amendment rights under the United States Constitution. And so as to avoid this court from formulating a belief that plaintiff makes statements that are not truly verifiable facts he offers the following facts to show all the documented times plaintiff implored defendants to not violate his rights.

(203)  Plaintiff asks that this court and jury turn back to paragraph (88) supra for those complaints filed specific to BSP.

(204)  Further kiosk complaints are as follows: inquiry **NJSP20001678** dated 1/15/2020 concerning receiving the alleged 1/3/2020 decision and being left on PHD 11 extra days, inquiry **#NJSP20001813** dated 1/16/2020 concerning having no access to legal Lexis Nexis research, grievance **#NJSP20001975** dated 1/17/2020 concerning BSP theft of property, grievance **#NJSP20002150**  dated 1/19/2020 concerning BSP set up and destruction of word processor and stealing and reading plaintiff's mail, inquiry **#NJSP20002492** dated 1/22/2020 concerning theft of property at BSP, inquiry **#NJSP20002608** dated 1/23/2020 concerning needing word processor altered by BSP, grievance **#NJSP20002754** dated 1/24/2020 concerning (4) extra points illegally assessed plaintiff, grievance **#NJSP20002757** dated 1/24/2020 concerning theft of O.P.R.A. records plaintiff wanted defendant Gramp to return and it clearly has defendant Richards obstruction of resolution, inquiry **#NJSP20022937** dated 1/26/2020 concerning being intentionally left on PHD confinement (10) extra days by defendant DiBenedetto not forwarding her paper work to NJSP, inquiry **#NJSP20003287** dated 1/29/2020 concerning plaintiff acknowledging being provided his word processor and BSP intentional removal and theft of parts from it, grievance **#NJSP20003291** dated 1/29/2020 concerning ignored and un-processed paper

grievance complaints -(and a note here: plaintiff discusses these paper inquiry and grievance complaints that have been intentionally obstructed in both SWSP and NJSP, below in this complaint)- that were not responded to, inquiry **#NJSP200035420** dated 1/31/2020 concerning property claim [**#20-0111**], with 100 receipts not being picked up, grievance **#NJSP20003669** dated 2/1/2020 concerning access to Lexis Nexis research while being detained in the administrative segregation unit pursuant to defendant DiBenedetto's alleged 1/3/2020 decision, where plaintiff was sentenced to 180 days punishment and 60 days loss of good time, inquiry **#NJSP20003672** dated 2/1/2020 concerning counselor Michelle Renaud and defendant Matthews filing plaintiff's BSP claim #20-0111 with supporting documents for property theft that occurred 12/17/2019, inquiry **#NJSP20003858** dated 2/3/2020 initially filed by plaintiff on 1/3/2020 concerning no investigation conducted after plaintiff pointed out theft of a different log book (14) pages stolen at SWSP 1/3/2020 by an Officer named Smith, inquiry **#NJSP20003976** dated 2/4/2020 originally filed by plaintiff on 1/11/2020 concerning continual PHD confinement, this is a perfect example defendant McDuffie pretends to answer prisoner complaints while obfuscating and obstruction of actual investigation into plaintiff being illegally confined to PHD confinement without any lawful reason, grievance **#NJSP200005394** dated 2/14/2020 concerning paper inquiries filed since being confined in NJSP that had never been addressed concerning being denied shaving, law library access, clean clothing exchange since 12/17/2019, kosher food , pillow, no PHD oversight, illegal PHD confinement, no shower shoes, no emergency commissary, grievance **#NJSP20005828** dated 2/17/2020 concerning still being denied kosher food diet, grievance **#NJSP20006549** dated 2/22/2020 concerning plaintiff being punished and retaliated because he wrote concerning conditions of his confinement at BSP, which defendant Richards is seen to be personally on notice of by his written words, grievance **#NJSP20006551** dated 2/22/2020 concerning plaintiff alleging First, 5th, 6th, 8th, and 14th Amendment rights and pendant New Jersey statutory crimes against computers and data storage theft violations and that plaintiff was putting NJDOC on notice by reminding that Elsie Sanchez had sent on 1/29/2020 that E-mail with (14) <u>attachments</u> which both defendants Richards and Emrich are noted writing to plaintiff, grievance **#JNSP20006887** dated 2/24/2020 concerning rapists and child predators who are not even Jewish receive kosher diet food but plaintiff still is being refused kosher diet, grievance **#NJSP20007660** dated 2/28/2020 concerning being on being in the administrative segregation unit for over (10) weeks which defendant Emrich said plaintiff would be reviewed for a <u>level</u> change in March, by the SASRC meeting, grievance **#NJSP20007951** dated 3/1/2020 concerning (6) extra points instead of the (2) extra points appropriate, this was directed to defendant Fairweather who used her <u>cut-out</u> Cindy Ford to run interference for her rather than showing she had <u>direct</u> notice and we see an example of the cover-up concerning defendant Maines at classification committee on 12/4/2019, where he assigned (4) extra points in retaliation to plaintiff writing to defendant Falvey for O.P.R.A. records #17144 and writing defendant Gardner the letter to SID on 12/3/2019, grievance NJSP20009818 dated 3/13/2020 concerning plaintiff still being denied kosher diet food, for at that point, (93) days, grievance **#NJSP20009877** dated 3/14/2020 concerning still being denied kosher diet food and finally it shows on 3/18/2020 that defendant Emrich writes plaintiff stating him being approved for kosher diet which plaintiff acknowledged receiving since only 3/20/2020 and where he asks why he had been denied kosher diet food for over (3) months and defendant Emrich avoids the answer to that question, grievance **#NJSP20010438** dated 3/18/2020 concerning plaintiff complaining that the normal (60) day S.A.S.R.C. review had not been done

and defendants Richards and Emrich both write they are aware of plaintiff not being allowed that review until 4/16/2020, grievance #NJSP20010782 dated 3/20/2020 concerning defendant acknowledging that plaintiff would not be scheduled for SASRC review until mid April, inquiry #NJSP20013680 dated 4/10/2020 concerning a paper grievance plaintiff filed 1/14/2020 and we see that defendant answers it on 4/21/2020 (98) days later -(when the time to respond to a grievance is 30 days)- and lies to plaintiff by obfuscation in the telling that "responses will be sent in accordance with the designated time frames" this is exactly the obstruction plaintiff has become to expect from defendant Emrich where she knows the times for processing inquiries and grievances and knows at the time she writes to plaintiff -(4/10/2020)- that she was aware that defendant McDuffie had not followed the procedure, this is the type of pattern and practice that plaintiff has been alleging is the intent of defendants; they pretend form over any substance, inquiry #NJSP20013685 dated 4/10/2020 concerning the Lexis Nexis access still not being up-dated since 8/2019 and defendant Richards -(who at the time he wrote to plaintiff, knew that NJSP had entered into a fraudulent contract with oceans computer company, who had not been up-dating the Lexis Nexis satellite computers since 2019 and did nothing to get them up-dated)- was intentionally lying to plaintiff where he writes "Please utilize the G-27 para legal process until we can get a vendor in to update the kiosks", this is a lie, though someone looking in from the outside of prison would not notice anything amiss; but defendant Richards knows his suggestion to plaintiff to utilize the G-27 process would not provide plaintiff any access to legal research of case law that is the only thing that kiosk is used for, and the para legals are only allowed access about once every (10) days and therefore there cannot be meaningful resort to them to accomplish access to the legal research tool Lexis Nexis kiosk, so this is a perfect example how these defendants operate by writing something that appears responsive to the prisoner's complaint, while actually doing nothing but continue their pattern and practice of using the Inmate Remedy System as a tool to pretend problem resolution that only looks good on paper, grievance #NJSP20013910 dated 4/10/2020 concerning O.P.R.A. record 17734 illegally confiscated on 4/10/2020 that plaintiff sought the help of defendant Sears and he refused to respond to, grievance #NJSP20013912 dated 4/12/2020 concerning continuation of grievance #NJSP20013912 because plaintiff ran out of space to write, as the system allows space for only 999 letters per complaint, anyway, defendant Sears did not respond to this grievance either, inquiry #NJSP20013986 dated 4/13/2020 concerning plaintiff writing to the Administrator concerning the stolen O.P.R.A. records authorized under #17734 by defendant Falvey on 3/3/2020, and defendant Sears wrote an answer "SID has your items. According to reports, you were using these documents in an unauthorized manner", this court and jury will see at trial that defendant Sears had told a complete lie as no reports from the confiscating officer nor any employee wrote that plaintiff had used those documents in an unauthorized manner; the fact is that this is further proof that these defendants are engaged in a pattern and practice to utilize the Inmate Remedy System as a smoke screen, while they are using it to obfuscate and obstruct due process of law concerning the confiscation of constitutionally protected First Amendment access to possession of reading materials authorized for possession by NJDOC via defendant Falvey and to refuse to provide any post confiscation Due Process of law that is required by Statutory codified regulations. This is a pattern and practice and a conspiracy to deprive plaintiff all post confiscation due process, grievance #NJSP20018016 dated 5/9/2020 concerning plaintiff writing to Central Office which is defendant Fairweather's area and she

answers plaintiff's complaint concerning being stonewalled and lied to
concerning the O.P.R.A. records stolen on 12/17/2019 at BSP by defendants
Ng and Pepper, by stating "property matters are not addressed via the jpay
kiosk" here we see defendant Fairweather pretending plaintiff is addressing
property per se when it is clear that he is addressing the failure to
investigate employee theft of constitutionally protected records, grievance
NJSP20019043 dated 5/16/2020 concerning officer Kovacs stealing commissary
form from plaintiff's mail slot on 5/2/2020, that was recorded on security
camera outside plaintiff's cell, that caused plaintiff to loose scheduled
commissary defendant Richards refused to order plaintiff be allowed to receive
commissary, grievance NJSP20020311 dated 5/24/2020 and grievance continuation
NJSP20020313 dated 5/24/2020 and grievance NJSP20020435 dated 5/25/20920
concerning notice being provided to all defendants of the E-mails sent by
Elsie Sanchez to all defendants concerning illegal theft of personal and
intellectual property at BSP on 12/17/2019, and the attempt at misdirection
by defendant Fairweather, grievance #NJSP20023921 dated 6/12/2020 concerning
again attempting to have an investigation by defendant Burke concerning the
12/17/2019 fabricated charges and destruction of evidence and other criminal
activity by defendants Ng and Pepper, this was directed to defendant Burke
because she is an attorney and in charge of regulatory and legal affairs
for NJDOC, and defendant Fairweather's cut-out Ms. Cindy Ford writes "this
matter will be referred to Office of Legal & Regulatory Affairs for review",
and we see that this again is appearing like normal communication except
for the fact that no one ever responds to the actual complaint, all that
actually being done time and time again is in perpetuity a circular pretense
of addressing complaints designed to never actually resolve anything and
in the process the obstruction of and deliberate indifference to correction
staff being investigated and or stopped from continuing to violate and to
make any effort to provide any supervisory control over corrections employees
that were violating plaintiff's clearly defined constitutional rights to
possess authorized intellectual property and be free from fabricated
disciplinary charges by the intentional destruction of foundational evidence,
grievance #NJSP20024880 dated 6/25/2020 concerns defendant Burke obtaining
(10) yellow lined pages retained by SID from plaintiff's missing diary log
book that came to be known to exist based upon (2) 171-1 and 171-11 contraband
receipt forms that BSP SID put inside the box on 6/19/2020, this is important
because it is the first time plaintiff was provided any information as to
the disposition of his diary log book stolen 12/17/2019 and it is evidence
denied plaintiff prior to the hearing officer's (defendant DiBenedetto's
decision alleged to have been rendered 1/3/2020) and again Ms. Ford runs
interference for defendant Burke by again writing "This will be referred
to the Office of Legal & Regulatory Affairs" which again is circular
circumnavigation specious obstruction and deliberate indifference to
protecting plaintiff's rights not to be retaliated against for lawful writing
down and collecting and memorialization of facts to support civil rights
redress in court and writing books on the illegal prison experience, grievance
#NJSP200255190 dated 6/29/2020 concerning complaint made to defendant Richards
about being left (10) extra days illegally kept on PHD total restrictive
confinement from 1/4/2020 - 1/15/2020 and we see this defendant pretending
openly that plaintiff is speaking to Level 1 Ad Seg status when the complaint
was clearly addressing the illegal retention on restrictive PHD confinement
for (10) days, inquiry #NJSP20026155 dated 7/2/2020 concerning plaintiff
appealing the illegal confiscation of O.P.R.A. authorized records that
defendant Falvey authorized and which were records returned by SID 6/19/2020,
these records were illegally ordered confiscated by defendant Emrich with

with no post confiscation due process, this complaint also put defendant Emrich on notice plaintiff was objecting to the confiscation and would follow up with a formal letter, which he did, that will be provided below as additional facts of these matters concerning continual pattern and practice of these defendants to confiscate and or steal authorized O.P.R.A. records without following the post confiscation due process already described in this complaint supra, inquiry **#NJSP20026395** dated 7/4/2020 concerning plaintiff's formal appeal to the illegal confiscation of O.P.R.A records ordered by defendant Emrich on 7/3/2020, where she refuses to provide the required post confiscation Due Process, with this clear abuse of her position, her written statement **"you received a copy of the confiscation form listing the IMPs that were not returned to you"** as if this statement is some how the legal standard for post confiscation due process, it speaks of her and these defendants utter disregard for the rule of law, grievance **#NJSP20026695** dated 7/6/2020 concerning plaintiff addressing defendant Kemble about the fraudulent confiscation of O.P.R.A. records 17734 and defendant Emrich reiterates her diatribe concerning being provided a receipt for the theft of the O.P.R.A. records, then defendant Richards writes that **"NJSP Administration is consulting with Mr. Falvey on this matter"** at the present date of plaintiff typing this portion of this complaint in is 4/27/2021 more than 8 months after defendant Richards response (made 8/4/2020) and over (1) year after the illegal confiscation of this O.P.R.A. record #17734 was done by officer Kovacs and still the record has never been returned nor any post confiscation due process, **and** grievance **#NJSP20026853** dated 7/7/2020 concerning plaintiff writing to defendant Hicks about pattern and practice by NJDOC employees confiscating plaintiff's duly authorized possession of O.P.R.A. records and defendant Fairweather and her cut-out proxy Ms. Ford promising that plaintiff will receive a written response to his 6/19/2020 (9 page letter), and of course no response was ever provided.

(205)  This is a list of only **SID** complaints made on electronic kiosk comprising inquiries and grievances that show the facts that underpin this 42 USC 1983 civil Rights Complaint: grievance **#BSP19030622** dated 12/16/2019 concerning the reason plaintiff was set up for fabricated charges 12/17/2019, and the first O.P.R.A. theft on 12/3/2019 by defendants Lawson, and Miglio of O.P.R.A. record #17144, this is very compelling evidence that will be developed in discovery and at trial that will be crushing evidence against certain of these defendants, grievance **NJSP20001811** dated 1/16/2020 concerning the BSP fabricated charges and corruption, here we see defendant Kemble doing nothing to protect plaintiff's rights not to be set up for filing complaints to SID, and have mail stolen by defendants, nothing was done, grievance **#NJSP20001977** dated 1/17/2020 concerning preserving the security film for BSP F-128 cell after 8:20 P.M. to preserve evidence of the theft of almost all of plaintiff's personal property, also requested that an investigation be conducted and again defendant Kemble did nothing, grievances **#NJSP20002049 and NJSP200029051** dated 1/18/2020 concerning missing (100 page) diary log book stolen by defendants Ng and Pepper, and violations of 2C:28-6 for tampering with evidence and 2C:28-7 (b),(1),(2) & (3) for destroying evidence and again defendant Kemble did nothing, except that he demurred to plaintiff that **"this is not a forum to make accusations of deliberate indifference"**, grievance **#NJSP20002154** dated 1/19/2020 concerning description of certain items that would be seen on the BSP security film of F-128 on 12/17/2019 and no response from defendant Kemble, grievance **#NJSP20002255 and NJSP20002261** dated 1/20/2020 concerning plaintiff asking that a search be done in BSP Housing Unit F for paper back books belonging to plaintiff

specifically his DSM-5 diagnostic manual of mental disorders, which all had his name written on each book in magic marker and missing floppy disks, and again defendant Kemble did nothing, grievance #NJSP20002388 dated 1/21/2020 concerning the 12/16/2019 complaint plaintiff had written on the kiosk SID #BSP19030622, and also requested that SID schedule plaintiff for a polygraph examination, and defendant Achinko reviewed that grievance and then decided not to respond to plaintiff nor to do anything, which is significant here since this Court and jury will recall at paragraphs (129 & 130) of this complaint, that plaintiff had met with defendants Gardner and Achinko, where extensive audio visual recording was done by those defendants to record the entire meeting, where plaintiff explained the entire illegal conduct, known to him at that time, that formed the basis of plaintiff being set up with fabricated charges, to include the commitment by them that to locate the (3 page) hand written letter plaintiff sent to defendant Gardner on 12/4/2019), and they would find the missing diary log book and review all the security recordings done by defendant Alexander and the security recording from BSP F Housing Unit and consider plaintiff's request for SID to provide that polygraph examination, instead, he did nothing, grievance #NJSP20002390 dated 1/21/2020 concerning a request as to when a polygraph could be scheduled and defendant Kemble responded with "your request was received", then plaintiff wrote -(appealing that non-response)- a disparaging remark and defendant Kemble stated ..."I informed you that your grievances were forwarded for review", and nothing again was done by this defendant other than taking issue with plaintiff's apt description made about his response -(mealymouthed bull s  t)- (which is what plaintiff had written to him in that appeal), inquiry NJSP20002938 dated 1/26/2020 concerning the statement defendant Pepper made to defendant DiBenedetto at the confrontation portion of the alleged hearing, when both he and defendant DiBenedetto did not realize that plaintiff and his paralegal assistant David Ribble was still within earshot, -(note: plaintiff is loath to use the word hearing out of context because the confrontation portion, which lasted less than Ten minutes was the only time plaintiff was actually at a hearing room, but after this confrontation portion was done plaintiff was never brought back to actually have the hearing)- that he had "turned over to Bayside SID allot of paper work not at the hearing", and plaintiff addressed this grievance to defendant Grade and the issue of paper work not itemized in this matter, etc., and again no response from defendant Kemble, grievance #NJSP20004772 dated 2/10/2020 addressed to defendant Kemble concerning SID playing games investigating stolen mail addressed to defendant Grade and Corrections Ombudsman , Defendant DiBenedetti, and he refused to answer so plaintiff appealed on 2/17/2020 demanding to know the name of person investigating all the complaints plaintiff made about BSP defendants Ng and Pepper who fabricated those charges to separate plaintiff from his legal documents?  and defendant Kemble answered "the only information NJSP/SID will provide you with, is that your complaints are being looked into.  Other than that I am not bound to disclose any information to you. Your grievances are being forwarded to the investigator handling your case", so we see that this is the first time any SID employee has stated that there was an investigator handling plaintiff's case, inquiry #NJSP20004775 dated 2/10/2020 concerning plaintiff's question as to who exactly defendant Kemble was and he responded "David Kemble badge #269 NJSP/SID.", inquiry #NJSP20007658 dated 2/28/2020 concerning plaintiff writing to defendant Kemble and asking the name of the alleged SID investigator working on his case and defendant Gadecki responded "your case is actively being investigated. and should the assigned staff need further information from you, another interview will be conducted", at the date of

this paragraph 4/29/2021, (14 months) has elapsed and no actual investigation
has been conducted, plaintiff knows this to be true because the film from
12/17/2019 clearly shows defendant pepper in possession of the (100 page)
diary log book, that he then destroyed or otherwise hid from the pending
official hearing that he was a confrontation witness at and stated there
was no diary log book, at that point he had violated at least (4) indictable
offenses, which would mean that he would not presently be  employed at Mid
State Correctional Facility with the rank of Lieutenant, he would have been
arrested at the very least, and would not still be working as a correctional
employee, it is simple deductive logic based upon the  objective facts this
case presents; so we have only lip service at this point (14)months after
the security film recorded these crimes and no investigation, only a series
of disinformations to obstruct and obfuscate plaintiff from relief from
illegal retaliation and plaintiff establishing the known and available
evidence of violations of his civil rights guarenteed under the First and
Fourteenth  Amendments  to  the  United  States  Constitution,  grievance
**#NJSP20008678** dated 3/5/2020 concerning plaintiff advising that defendant
Pepper should be in handcuffs and also what about the illegal piracy of cable
tv being done by officers and that defendant Easley handed by plaintiff on
1/10/2020 many certified affidavits with dates concerning the fabricated
charges and illegal activity at BSP   -(that he was handed to make copies
he said that he did upon handing them back a few days later)-, that was the
reason plaintiff  was being punished in Ad Seg and again defendant Kemble
did not respond, other than to say **"This information will be forwarded for
review"**, inquiry  **#NJSP20013988** dated 4/13/2020 concerning the illegal
confiscation by officer Kovacs of O.P.R.A. record #17734 kovacs of the (22
page) O.P.R.A. record #17734 taken on 4/10/2020, defendant Kemble refused
to respond, other than **"received"**, grievance **#NJSP200142029** dated 4/14/2020
concerning follow up to inquiry #NJSP20013988, plaintiff complains that there
is a cover-up to the confiscation of the O.P.R.A. records #17734 and defendant
Kemble writes his response on 4/14/2020  **"the matter is being looked into"**
then on 5/11/2020 defendant Gadecki  looks at the grievance but does nothing,
today as plaintiff writes these words at this point in this complaint the
date is 4/29/2021 over One year has passed and still this O.P.R.A. record
#17734, authorized for plaintiff possession by  defendant Falvey on 3/3/2020,
has still not been returned, grievance **#NJSP20017069** dated 5/2/2020 concerning
defendant Sears telling plaintiff in person that the O.P.R.A. records #17734
was given to SID, when no answer was received by defendant Gadecki other
than **"noted"**, he filed an appeal and was answered by defendant Gadecki on
5/5/2020 where  he wrote specious mealy-mouthed lies that this jury and court
will come to understand upon examining this response, how egregious and
intentional this defendant, as well others in SID are also involved in a
pattern, policy and practice of obstruction and obfuscation designed to
prevent plaintiff from post confiscation due process and what is most
disgusting is that NJDOC SID is the investigation division that when presented
with crimes and regulatory violations that deprive prisoners of rights and
privledges  in an unauthorized and illegal manner, it devolves to their duty
to hold corrections employees accountable; SID is the police to the employees
who violate plaintiff's clearly established rights and refusing to do that
duty and continue to lie and obstruct can be seen here to be part of a
conspiracy  to  prevent  plaintiff  from  obtaining  due  process,  inquiry
**#NJSP20017912** dated 5/8/2020 concerning plaintiff writing that SID is involved
in a systematic pattern to undermine plaintiff's rights to possess lawfully
authorized O.P.R.A. records and plaintiff also implicated defendant Davis
in  that  conspiracy,  and  defendant  Kemble  wrote  **"noted"**, grievance

#NJSP20018447 dated  5/12/2020 is a  grievance and an appeal of the inquiry #NJSP20017912 and  it again repeats the allegations made in that inquiry, also plaintiff asked again what was the name of the SID investigator currently investigating the theft of O.P.R.A. records and Defendant Kemble answered with **"SID investigations are confidential"**, plaintiff asked for the name of the <u>investigator</u> not the <u>investigation</u> per se, grievance **#NJSP20023291** and **#NJSP20023292** dated 6/14/2020 concerning defendant Sears falsification of official records by falsely stating in inquiry #NJSP20013986  dated 4/28/2020 that plaintiff had used the O.P.R.A. records in an unauthorized manner, -[#17734]- this lie is easy for this court and jury  to see because there was no such report ever written or contemplated as there would be a record of it in plaintiff's classification folder which was just provided in August of 2020 by the New Jersey Attorney General's Office, this was reviewed by defendant Gadecki who wrote **"noted"** and by defendants Emrich and Richards who did nothing, inquiry **#NJSP20025344** and **#NJSP20025351**  dated 6/28/2020 concerning plaintiff informing defendant Achinko that he had finished constructing the (9 page) 6/19/2020 - 6/25/2020 dissertation on the 1600 plus pages of O.P.R.A. records returned to plaintiff that had  been sent from SID in BSP to NJSP and delivered to plaintiff's cell on 6/19/2020, and most important was the <u>notation</u> -(2 confiscation #1771-I and #177-II forms that SID wrote a note to plaintiff, on the bottom of them, which were copies of those  same forms that were dated 12/17/2019)-  telling him that (10) yellow pages were retained and plaintiff asked when he would receive them back so he could provide  a copy to attorney <u>Michael Poreda</u>, so he could provide the Superior Court Appellate Division  a copy for use in a motion for supplementation of the record in plaintiff's ongoing appellate challenge to the decision of defendant DiBenedetto's guilty decision allegedly rendered 1/3/2020, no response was provided, inquiry **NJSP20026162** dated 7/2/2020 concerning plaintiff asking defendant Kemble to return his  O.P.R.A. record #17734 (22 pages) and he replied **"I am not in receipt of your paperwork,"** **and** <u>finally</u> in this SID series: grievance **#NJSP20034350** dated 8/23/2020 concerning appealing the non-response to inquiry #NJSP20026995 dated 7/6/2020 -(which continued plaintiff's attempts at redress )- of  illegal confiscation and retention with no post confiscation due process  of O.P.R.A. record **#17734**, and defendant Gadecki wrote more of nothing concerning defendant Sears falsifying official records in inquiry #NJSP20013986 on 4/28/2020, and defendant Gadecki answered on 6/22/2020 with **"noted. thank you"**, plaintiff appealed and stated he wanted the O.P.R.A. documents returned and both defendants Emrich and Richards logged in but refused to respond.  In sum this extensive record of actual written facts digested in paragraph (105) and this instant paragraph (106), of this complaint, finds plaintiff, this court and the jury with a factual basis to weigh defendants  -(associated therewith)- involvement in a pattern and practice to obfuscate and obstruct plaintiff from all post confiscation of (3) different sets of O.P.R.A. records that were confiscated on Three separate dates and then refused to provide post confiscation due process required at  the very least by the codified regulations envisioned by the promulgation of N.J.A.C. 10A:18 inter alia. aforementioned.

     (206)  Plaintiff asks that this court and jury accept his apologies for having to spend time reading through pages (35) through this page (42) that are comprised of so many recitations of the Inmate Remedy System inquiries and grievances  plaintiff filed on the electronic kiosk; this was very necessary, because as a prisoner plaintiff is extremely limited in any meaningful process to establish facts concerning the day to day life in prison that now reaches this court and this jury as vital facts and proofs and evidence.

(207)  Plaintiff has been a paralegal since 1987 and when he was convicted of burglaries and theft crimes in 2015 he knew from legal research that there had been established through an Act of Congress in 1996 fairly consistent federal case law, concerning prisoner treatment and the civil rights of prisoners and plaintiff realized that he needed to fully inform himself in the current case law and the various directives that control his prison rights and responsibilities.

(208)  Plaintiff started collecting case law concerning his criminal case and civil rights within the NJDOC and New Jersey District Court and the controlling 3rd Circuit Court of Appeals.  Also plaintiff started to acquire through the Freedom Of Information Law that is known in New Jersey as Open Public Records Act (OPRA), a large and diverse amount of records.

(209)  Plaintiff, under O.P.R.A., that is slightly modified for records access to prisoners, started collecting those O.P.R.A. records authorized for possession, by making direct written application, using an "O.P.R.A. Request Form" to the attorney at Central Office of the NJDOC, −( who's extensive knowledge of every Directive (also called IMP) and other records that are created and or possessed within NJDOC)− is the defendant John Falvey, who to date has received over (210) O.P.R.A. requests from plaintiff starting on or about February of 2017. This fact needs to be established as plaintiff moves on to address the nuts and bolts of what other facts led up to the primary axis upon which this case exploded into retaliatory crimes against plaintiff from 12/3/2019 − 1/3/2020 and beyond.

(210)  To coin the phrase primary axis again here, plaintiff moves to BSP property room. The primary axis for plaintiff's damage by these defendants has it's foundation in plaintiff's possession of authorized O.P.R.A. records which were fairly extensive at the time he was transferred to BSP, and within the property room, was conducted and an extensive search of plaintiffs inordinately voluminous property −(13 large boxes)− and −(4 large plastic containers)− that was "substantially an amount more than the amount of permissible property allowed" as digested by property room Sergeant James Probst on 10/10/2019 via the electronic kiosk inquiry #BSP19024539, which took at least (4) days to search.  And it was at this time that BSP became aware of the extensive amount of legal books, property, and legal records to include the Thousands of pages of O.P.R.A. records consisting of rules, policies, IMP's, employee names, titles and salaries, employee contracts for employment, medical, commissary, pest control and cable tv vendors. Officers were all talking about the NJDOC records possessed by plaintiff and defendant Devol and other officers asked if plaintiff was working for SID or was he an attorney. Plaintiff always told them he was a paralegal nothing more complex or odious than that.

(211)  Plaintiff received his property on or about 10/15/2019 but non of the electronic property such as word processor or tv or fan, until plaintiff was transferred out of the trailer 2 Complex which was open bunk bed housing divided (16) prisoners per trailers A − F.

(212)  So it is clear that officers were very concerned about the type and breadth of NJDOC records possessed by plaintiff even though there were most of them attached to the authorizing paperwork and where not actually attached there was Two large clear (13) pocket accordion file folders containing all records of every NJDOC document possessed by plaintiff, kept in full view next to all the NJDOC records.  And as plaintiff always does

all of his O.P.R.A. NJDOC records were stapled in approximately 50-70 page compilations that were stapled on the left side with 5-8 brief staples, thus making these compilations easy to read like a booklet and also virtually indestructible to the most rigorous security cell and property searches within a prison plaintiff makes this observation here because it is the same brief stapling that was done with the (100 page) diary log book that defendant Pepper is observed for about (15) minutes on the security film located in F-Housing Unit of BSP on 12/17/2019 reading and at times clearly recorded as becoming angry and attempting to tear it apart as he read something plaintiff had written concerning fellow employees breaking the law.

(213) At this point plaintiff reminds the court and jury to pay close attention to defendant Pepper's face and hands and body language as he stands there at the officer desk area on the F-Housing Unit on 12/17/2019 flipping over and over page by page the (100 page) diary log book and the violent anger that can be seen from him as he continued to read, this is the book he pretended on confrontation at SWSP on 1/2/2020, that he never possessed.and was only some loose pages.

(214) On 12/17/2019 both plaintiff and defendants were subject to pre-existing IMP regulations that controlled the SID, and to understand the duty and power to address and prevent crime and constitutional violations within the closed world of prison life for inmates and officers under the control of NJDOC SID, we find the IMP #ADM.006.000 titled Special Investigations Division Mission, Goals and Objectives and Organizational Structure. This IMP is allowed for possession by plaintiff and it states clearly at page (2) that "It is the mission of the Special Investigations Division to insure that investigations are conducted into possible violations of the law and NJ Criminal Code (Title 2C), as well New Jersey Administrative Code (Title 10A)...NJ DOC policies and procedures by NJ DOC inmates and staff, as well as individuals outside the Department who violate or for whom there is a reasonable suspicion of having violated the law relative to the NJ DOC".

(215) When plaintiff was removed from BSP on 12/17/2019 and placed on PHD confinement in SWSP for the very serious charges that included alleged planning of an escape (charge 102) and the interview by SID the following Morning 12/18/2019, a series of procedures of the SID were required to be conducted. And additionally, any inmate complaints of abuse by staff or allegations of conditions of confinement that were illegal are required to be addressed by the SID.

(216) The procedures for SID are identified in these IMP's: IMP#ADM.006.SID.007 entitled Storage, Handling and control of Contraband Evidence, IMP#ADM.006.SID.034 entitled Electronic Surveilance, IMP#ADM.006.035 Investigative Procedures, IMP#ADM.006.036 entitled Recorded Statements, and IMPADM.006.037 entitled Videotaping of Incidents and/or Movement of an Inmate. The importance of these listed IMP's cannot be overstated here because they are the core of evidence collection and preservation that was done or not done in this case and this court and jury cannot learn the truth from what plaintiff claims or what defendants claim, as to any matter touching upon an SID investigator, that will effect review of any relevant material fact in this complaint, that may be inferred by such investigator and evidence under the review and control of such investigator.

(217) Plaintiff was at all times from 2014 through present determined by Federal Social Security Administration to be disabled.

(218)  Plaintiff must follow all posted rules and regulations that NJDOC requires him to abide by and he must do so without question. If plaintiff disagrees with a written rule or regulation he may file a challenge or complaint by filing an inquiry or grievance in paper form or on the electronic kiosk.  Plaintiff has at all times relevant in this complaint become aware of <u>all</u> rules and regulations and knows that on 12/17/2019 he was not in violation of any rule or regulation of NJDOC.  The following are the facts that establish why plaintiff knows each regulation and rule he must abide by unconditionally:  The construction of regulations and rules that plaintiff is responsible to abide by unconditionally is controlled by **IMP #ADM.012.000** entitled <u>Administrative Rules Unit Mission, Goals and Objectives</u>; this IMP sets forth the requirement for initial Administrative Rule construction that turns into a policy, practice and procedure that will become an IMP. **IMP#ADM.001.DOC.001** <u>entitled Development of NJDOC Policies and internal Management Procedures</u> is the next step in rules and regulations that plaintiff is required to abide by unconditionally and it starts with the operational unit called Administrative Policy and Procedure Manual Unit **(APPM),** Then **IMP#ADM.001.IMP.001** <u>entitled NJ DOC Level 1 internal Management Procedures Emergency Promulgation</u> along with **IMP#ADM.001.DOC.001** <u>entitled Development of NJDOC Policies and Internal Management Procedures</u> sets forth a very concise and easy to read and understand construction of all rules and regulations, policies and procedures that control inmate and employee alike within the control of NJDOC, and **IMP#ADM.001.DIR.001** <u>entitled NJ DOC Directives: Distribution Procedures</u>, this IMP provides distribution procedures for staff to receive various IMP's and written policies and procedures.  Plaintiff believes that the above cited IMP's are necessary for this court and jury to have access to in order to have a factual basis for rules and regulations plaintiff is required to abide by and the processes that form the basis for rule and regulation construction that is necessary for resolving factual issues of rules and regulations that did and did not exist on 12/17/2019.

(219)  Plaintiff had also read the NJDOC "Handbook of Information and Rules for Employees" dated January 1995.  This employee rule book plaintiff had already but wanted to determine if it was still current as of the date 12/17/2019 so on 1/22/2020 defendant Falvey authorized plaintiff to possess it via O.P.R.A. record request #17552.  At page (7) of that rule book paragraph (R) "Employees <u>will</u> show a scrupulous regard for the personal property of inmates. When it is necessary to confiscate unauthorized personal property of **whatever** value, it will be turned over to <u>superior authority</u> for suitable disposition".  On 12/17/2019 defendants Ng and Pepper during and after filing fabricated disciplinary charges against plaintiff used that activity to conceal the **careful extraction** of <u>all written</u> or <u>typed</u> intellectual personal property that had been created and collected to record crimes being committed by NJDOC employees at BSP that were observed by plaintiff and illegal conditions of confinement that directly harmed plaintiff; and to accomplish the theft of that intellectual property they caused the theft of over $1,300 in personal property that plaintiff believes was a smoke screen that they did so that other items of property were stolen beyond the actual true purpose of the reason for the fabricated charges, they needed to create a false reason to read the legal and personal writings of plaintiff in this fabrication of charges it allowed the time to search for those writings and computer floppy disks, to be stolen.

(220)  Plaintiff filed a claim for the loss of personal property on 1/30/2020 claim #20-0111, that certain defendants refuse to investigate or process as of today 5/5/2021.

(221)   Plaintiff wants to state facts here that are consistent with his intentions in filing this complaint as it seeks to state facts concerning the property that defendants Ng and Pepper stole on 12/17/2019. The fact is that the law will not allow this court or jury to hear plaintiff about the loss of personal property if New Jersey has a court that will. Plaintiff is providing facts of the theft of intellectual property, comprising personal memorialization of daily life in BSP and other prisons and book drafts and legal work, in the form of the loss of written, typed and stored in floppy disks, that defendants Ng and Pepper stole to prevent plaintiff from evidence in filing civil rights complaints and to punish plaintiff for filing complaints and collecting evidence in anticipation of  filing complaints against BSP and their friends and then SID defendants have covered up this illegal theft and retaliation and in the process of the cover-up they allowed the intentional destruction of evidence to taint the disciplinary hearing process that prevented plaintiff from due process before and during and after the decision allegedly rendered by defendant DiBenedetto on 1/3/2020.

(222)   Plaintiff must go back to previous paragraphs (193 - 196) concerning Commission of Investigations Executive Director defendant Lacky, plaintiff at the time of drafting those paragraphs was being prevented from access to use Lexis Nexis in the prison law library (since December 2020) and he needs to address the facts that underpin defendant Lackey's deliberate indifference.   Under the statutory requirements of his office are the following mandatory action on his part that he decided to obfuscate, and they are listed as follows:   **N.J.S.A. Title 52:9M-2** The Commission shall have the duty and power to conduct investigations in connection with: (a) The faithful execution and effective laws of the state, (b) The conduct of public officers and public employees. And **N.J.S.A. Title 52:9M-8 (a)** Except as provided in subsection (c) of this section whenever the commission or any employee of the commission obtains **any** information or evidence of a reasonable possibility of criminal wrong doing, the commission shall immediately refer such information or evidence to the Attorney General.

(223)   When plaintiff and his friend Mr. Lynch provided defendant Lackey overwhelming evidence, well beyond mere possibility, that defendants Ng and Pepper had stolen documents and floppy disks containing plaintiff's evidence against BSP staff and that letters to state officials had been stolen from the mail and then formed the basis for retaliatory fabricated charges and destruction of documents that were prevented from reaching an ongoing official hearing; all these are but a few of the criminal conduct that plaintiff and Mr. Lynch supplied to defendant Lackey who was required by law to at the very least, to provide the Attorney General a referral thereof, but decided not to do anything except to falsely state to plaintiff that there was no jurisdiction for any action, by him or the commission.

(224)   Plaintiff must explain his facts as they will be used for part of this lawsuit. That is to say, that there are clear prior court decisions that restrict certain claims that a prisoner -(plaintiff)- may bring to this court and before this jury, even if plaintiff has incontrovertible evidence that a hearing officer rendered a decision that is manifestly unjust, the controlling factual predicate, upon which plaintiff may file a claim against a disciplinary decision is limited to those cases where a direct appeal reverses or an executive order or a state tribunal or questioned by a federal writ of habeas corpus has been issued, and reverses such disciplinary decision in favor of plaintiff; and therefore plaintiff must offer this court and jury very specific facts that will allow him to make

certain claims in this complaint, because as of the date of the writing of this portion of this complaint -(5/7/2021-) plaintiff has not received a decision from the New Jersey Superior Court Appellate Division. But the law requires that this complaint be filed before (2 years) after the date 12/17/2019. The <u>facts</u> to support that this complaint is properly before this court and jury concerning the alleged hearing and 1/3/2020 decision of defendant DiBenedetto, are developed in the following paragraphs.

(225) Recent New Jersey District Court decisions support the position that this court and jury can hear plaintiff complaining, -(as he has throughout the pre-hearing stage, the post-decision agency appeal and the Superior Court Appellate Division appeal)- that plaintiff has a right to constitutional protections that include the disciplinary hearing process that is **free** of <u>perjury</u> and <u>deceit</u>, and free from the spoliation of evidence that may have supported plaintiff's most significant point concerning the (100 page) diary log book taken as a whole document, that provided the true context of those pages intentionally ripped out of that diary log book that were copied, cropped and copied again to create a false narrative and obfuscate the true context that the un-altered diary log book would have provided to the hearing officer, defendant DiBenedetto, the true narrative of plaintiff exercising his constitutional right to memorialize the daily prison life that directly effected his health, welfare and safety within the prison walls.

(226) Now plaintiff wants to move on to the decision of defendant alleged to have been rendered by defendant DiBenedetto on 1/3/2020.

(227) Defendant DiBenedetto wrote a One and One Third page typed decision with the date 1/3/2020 on the bottom. This decision she has marked at top right as **"AA1"**.

(228) We initially read, starting at **line 2:** ..."Nor will the inmate be allowed to use these proceedings as a personal investigation into paperwork he claims to be missing". This shows her utter disregard for plaintiff's written certification that complained of spoliation of the (100 page) diary log book last seen as a whole document on security film from Housing Unit-F in BSP on 12/17/2019, in the possession of defendant Pepper.

(229) Next we see at **line 5:** ..."All other long-winded conspiracy theories, inordinate lengths of statements and inmate rambling in not relevant <u>or being considered</u>". This is extremely important to take notice of here as plaintiff now shows this court and jury: Plaintiff wrote certified affidavits to include Second polygraph request that were described supra in paragraph (**160**), they were/are not conspiracy theories they are clearly plaintiff attempting to provide necessary facts to the hearing officer and an attempt to provide specific evidence and witnesses who plaintiff wanted to produce at a hearing of those charges filed against him 12/17/2019. The question that begs the answer is why did the hearing officer, defendant DiBenedetto, decide not to allow any of plaintiff's witnesses nor any documentary evidence or even to consider same as part of her fact finding and deliberative process? Especially where she refused to allow plaintiff to review any of the documentary evidence (**A6-1 - A6-16**), which also prevented plaintiff from pointing out that many documents were falsely identified as being written in BSP and about F-Housing Unit, where plaintiff could, present evidence to rebut the false reports and testimony of defendants Ng and Pepper.

(230) Next -(at **line 15**)- defendant DiBenedetto writes "A reasonable person would believe an inmate who has created a list of dimensions of cells, distance and steps to fences with measurements of fence height and length is obtaining the information for escape purposes. Inmate Gittens identified the locations of metal detectors, timing of custody movements and specific detail locations has been documented including specific officer's names, assignments and schedules", here defendant provides this court and jury evidence of her marshaling her view of the evidence that are documents **-(A6-1 - A6-16)**- that she comments upon that were not only against the actual weight of that evidence but also has again shown how very important it was for her to have allowed plaintiff to review those (16 pages) so that he would have the opportunity to rebut her characterization of the evidence. so we have her refusing to allow plaintiff to attend the hearing, while having denied him access to review all documents that comprised the only alleged evidence.

(231) Then we see -(at **line 20**)- defendant writes "Inmate Gittens is not assigned to be the keeper or investigator into government and state funding and has no clearance to scrutinize the abuse of over time by DOC employees. Further, despite inmate Gittens interest in the fire safety of the Bayside Trailers, he does not have the authority to inspect and examine the facility for compliance". Here we see that defendant DiBenedetto has given insight into here mistaken belief that plaintiff is **not authorized** to investigate illegal conditions of confinement where defendant Falvey who provides plaintiff with O.P.R.A. records to use in investigation of all areas that impact plaintiff's conditions of confinement. Plaintiff tells defendant Falvey each time he is investigating compliance with safety and funding matters and then defendant Falvey sends plaintiff those very documents. Plaintiff is in fact authorized to conduct investigations concerning illegal activity by NJDOC employees that are presented to plaintiff, there are no rules or regulations that prohibit plaintiff from these law full acts and that defendant DiBenedetto falsely writes otherwise, does not re-write those rules and regulations to make the lawful and authorized writings of plaintiff unlawful or unauthorized.

(232) Next defendant -(at **line 29**)- writes "Despite being made aware of the self-inflicted harmful effects of his monotonous and repetitive rhetoric inmate Gittens continues to submit documents for his defense which only support his continual inappropriate behaviors". Inmate Gittens shows no remorse for his self-fulfilling actions and refuses to cease his actions despite being advised that in the harsh reality of prison culture his actions must be viewed as dangerous and against policies". Since plaintiff was never allowed to attend a hearing other than the portion that was totally limited to confrontation of defendants Ng and Pepper that was less than -(10 minutes),- where in the hearing record is defendant DiBenedetto obtaining that plaintiff has ever done "inappropriate behaviors" because he submitted documents for his defense? And when was plaintiff required to show "remorse"? And what "actions" is defendant speaking about "despite being advised..."? What rule violation or behavior is this defendant saying that plaintiff has done as "against policies"? Is defendant DiBenedetto punishing plaintiff for writing certified affidavits in defense of fabricated charges? What has plaintiff done that was dangerous? And what does plaintiff being charged with stealing a safe have to do with robbery? Plaintiff has never robbed any person, but defendant DiBenedetto -(at **lines 29-30**) states that plaintiff has a history of "...robbing safes".

(233)  At **page (2)** defendant DiBenedetto states −(at **line 1**)− "DHO relies on all documents inmate Gittens possessed that would aid and assist him from escaping from the institution.  Inmate Gittens admits to possession of said drawings, maps and security details".  Plaintiff was never allowed to attend the hearing nor examine any of the "documents" she speaks about so her statement knowing that she prohibited plaintiff from examination thereof is at best **disingenuous,** and against the weight of objective evidence.

(234)  Next −(at **page 2 line 3**)− defendant DiBenedetto writes "His defense that information was [obtain] for alternate reasoning is not supported and is irrelevant."  Plaintiff has a right to establish his "intent" and to attend the hearing and examine and comment on the evidence which he was not allowed by defendant DiBenedetto to do.

(235)  Next −(at **page 2 line 4**)− defendant DiBenedetto writes "Inmate's intent is irrelevant if he possessed items that would aid in and consistent with planning an escape".  Since the documents that were alleged to form the evidence **−(A6−1 − A6−16)−** upon which defendant DiBenedetto relied upon for her alleged 1/3/2020 decision of guilt and punishment assigned plaintiff thereby, were not made in BSP or concerning BSP and there is no evidence that was presented to defendant DiBenedetto that established intent to or of a plan to escape.  But there is clearly contained within defendant DiBenedetto's writings that she believed that it is illegal for plaintiff to document BSP NJDOC employees illegal activities and illegal conditions of confinement and that with out evidence of intent she can extrapolate plaintiff's writing in his diary log book as evidence of planning an escape. Defendant DiBenedetto was required to allow plaintiff to comment on the actual −(16 **pages)−** A6−1 − **A6−16** of alleged evidence and only after she had allowed plaintiff an opportunity to examine then offer a defense, if any could be appropriate, then make here decision, but to make her alleged 1/3/2020 decision without allowing plaintiff that examination denied his of his rights in a fundamental manner to his constitutional right to have a disciplinary hearing free from spoliation of evidence and that allows an examination of the evidence against him.

(236)  Lastly, defendant DiBenedetto −(at **page 2 line 7**)− writes "Inmate Gittens role is of an inmate, his role is not to police the police, nor investigate the Department of Corrections, inmate Gittens must comply with the written rules of his position as an inmate".  Defendant DiBenedetto here again is pretending that plaintiff violated a written rule and goes even further −(at **page 2 line 9**)− where she writes "A reasonable person would believe the totality of drawings, sketches and information would be information to aid in an escape. "Again defendant DiBenedetto is pretending to rely on documents she refused as did defendant Falvey, plaintiff access to examine, and she has violated plaintiff's rights and protections guaranteed by New Jersey statutes, New Jersey Constitution, and Federal Constitutional Amendments by punishing plaintiff by defective due process at hearing, punishing plaintiff for his exercise of his rights to memorialize illegal conditions of confinement and illegally allowing the spoliation of the very documents that forms the basis of her alleged 1/3/2020 decision.

(237)  Defendant Falvey has provided, and plaintiff possesses, the training guide for Disciplinary Hearing Officers in conducting hearings. That document cites the two controlling cases that concern the required Due Process at a disciplinary hearing. Wolff V. McDonnell, 428 U.S. 539 and Avant V. Clifford, 67 N.J. 496.

(238)   Plaintiff mentions the Hearing Officer's training guide book (15 pages), and the two controlling cases cited supra, so that this jury can know that there is a factual basis for plaintiff to rely upon that he can point the jury to as to protections that should have been provided to plaintiff by defendant DiBenedetto, and oversight by other named defendants –(who were directly aware, and  had actual knowledge of this case, as addressed  supra in this complaint)– that had/have long been established and that defendants training and knowledge of the procedures and policies that were designed to conduct fair and impartial hearings when there is a misbehavior report alleging that an inmate has violated a written rule. In this case plaintiff was targeted for a cell search that was used to create a distraction –(a smoke screen)– so that documents plaintiff possessed could be obtained and destroyed or hidden, in a conspiracy by the named defendants to obstruct plaintiff from his constitutionally protected rights to  seek redress of illegal conditions of confinement.  Plaintiff has a history in New Jersey since 2016 of total objective clarity in <u>every complaint, every written letter, every document filed with any court and any complaint made on the electronic kiosk as an inquiry or grievance,</u> of **honesty.**  At trial when this court and jury sees the evidence and hears  and sees  defendants on the witness stand the truth will be known.

(239)   Before plaintiff forgets to describe the conduct of defendants Ross and Whilden, such is described as follows: On 10/30/2019 While plaintiff was waiting on line to use the phone in Trailer 2 Housing Unit, defendant Whilden  was watching the  illegal flat screen tv set   –(that was hidden in a blue wooden cabinet that  was connected to stolen Direct Tv Cable service that was pirated from inmate welfare fund paid for cable system)– and was openly smoking an electronic cigarette and was blowing out massive smoke plums that plaintiff observed and when defendant Whilden saw that plaintiff was observing her she entered into an agreement  with defendant Ross to threaten plaintiff and attempt to stop him from memorializing the observation of the illegal activities.  Defendant Ross called plaintiff over to the officer desk area and then defendant Whilden came up and said "why are you looking at me" and plaintiff responded that she, defendant Whilden, knew plaintiff was watching her blow out huge plums of smoke and  her watching illegal tv on illegal cable tv system paid for by the inmate welfare fund while the tv signal to the inmate tv had been intentionally disrupted, and defendant Ross threatened to have plaintiff set up –(and placed in Administrative Segregation)– unless he forgot what he saw and that plaintiff had better not write it down.  And defendant Whilden chimed in that she could have plaintiff sent back to the main compound if plaintiff did not stop watching  what officers were doing.  Plaintiff wrote about that incident in his diary log book and made a notation of that incident in the O.P.R.A. record #16358 next to defendant Ross's name and defendant Whelden's name –(but one of the officers who possessed this O.P.R.A. record #16358 at the officer desk  area on 12/17/2019, ripped out the notations next to defendant whelden's name)–.  And these Two defendants were <u>part</u> of the reason that plaintiff had his mail to SID and Corrections Ombudsman  stolen from the mail box on 12/4/2019 and on  12/16/2019 and 12/17/2019. These defendants were part of a group of officers at BSP that were corrupt and had been involved with an ongoing practice and pattern of intimidation and threats for inmates who were targeted as complainers or litigators, and  upon information and belief, this group used the phones, inside the prison –(called land lines)– as well as direct face to face communication to determine which inmates to target. Also upon information and belief these

defendants had some person or persons in the mail room and control center involved in tracking prisoner mail and movement for evil purpose not security, as well as private internet platforms to target specific inmates to include plaintiff in these illegal retaliatory practices for their ultimate goal to suppress complaints and punish and deter those inmates –(to include plaintiff)– from complaining about illegal patterns and practices at BSP.

(240) Plaintiff suffered the loss of his good time and was punished from 12/17/2019 until May 14,2020 with punitive confinement, loss of commissary privileges, phone and kiosk access, accesses to personal (100 page) diary log book, legal letters and typewritten complaints, floppy disks containing Two book outlines as well as civil rights court files in Gittens V. Bonds and Gittens V. Scholtz, and the Muller report sent to plaintiff by his attorney Levi Huebner (438 pages), and O.P.R.A. record request files and O.P.R.A. records, and books on writing books (4), and personal property, and forced to be confined at BSP in cells that were causing great pain and discomfort by placement in bottom bunk beds designed for inmates less than Five feet and Three inches in height, and roach infestation and deprivation of light to read; and each of these defendants were directly informed of plaintiff's complaints and took no action, in fact defendant brown was only concerned with how plaintiff knew the height of the head clearance on the bottom bunk, additionally, plaintiff was denied a polygraph examination when he offered <u>proof of spoliation and fabricated charges</u> and these complaints were treated with deliberate indifference.

(241) Plaintiff also filed an inmate property claim on 1/31/2020 numbered 20–0111 –(for the theft of personal property by defendants NG and Pepper on 12/17/2019)– with well over 200 receipts and certified affidavits and proofs in support thereof, and all due process has been denied to him as of this date 5/10/2021, the claim remains unprocessed and no investigation has, upon information and belief, ever been conducted, because BSP defendants have refused to cooperate with the investigation per Sgt. Omar Mendoza.

(242) Defendants from Central Office of NJDOC that were each officials with the power to investigate, and to order an investigation and who were in supervisory positions that provided the ability to supervise and correct the claims plaintiff has made in this facts section of this complaint, have not taken any action to stop the constitutional violations concerning the time plaintiff was at BSP, SWSP and NJSP, and were deliberately indifferent to these alleged violations after being repeatedly placed on actual and direct notice of them.

(243) Plaintiff has filed many more documents with these defendants that will, at trial support his position that is the key <u>overarching</u> theme within the Four corners of this complaint, which is that defendants, all of them when provided clear corroborated written communications, –(many of which were certified affidavits signed by plaintiff)– decided that the rule of law, the United States Constitution protected rights of plaintiff, (that were clearly established and understood as such by these defendants)– and their own mandatory regulations and policies, were not going to be afforded to <u>plaintiff's</u> **benefit** nor would anything that would require <u>accountability</u> for violations of the Rules, policies, regulations, statutes and New Jersey and United States Constitutions as against fellow NJDOC employees be allowed; and in fact with most, an effort to actually obstruct due process of law protections and procedures and investigations of such violations were

covered up as part of their pattern and practice of spoliation and obstruction of proofs of violations of procedural due process and substantive due process. these are the facts of this complaint now made for this court and jury.

(244)  No complaints concerning any of the NJDOC employees  named in this complaint as defendants resulted in any findings of fault by such employees; Chief among those NJDOC employees mentioned in this paragraph that were best positioned to protect plaintiff's rights were the SID defendants within this complaint who allowed the continual breaking of rules, rights and statutes and constitutional protections, in favor of a pattern and practice of covering up and assisting in continued constitutional violations as a direct and proximate result of their intentional misfeasance and malfeasance.

(245)  Plaintiff now completes this facts section of this complaint by noting the current date of 5/11/2021, where no decision has ever been provided to plaintiff concerning property Claim #20-0111 overseen by defendant Nathan has ever been rendered, and no procedural due process accorded plaintiff, which is an additional pattern and practice to deprive plaintiff of all constitutional protections required in the processing of inmate claims for property  -(stolen by NJDOC employees on 12/17/2019 at BSP from plaintiff's cell F-128)-  stolen as part of the conspiracy to fabricate charges and retaliate against plaintiff.

## CLAIMS

(246)  Plaintiff alleges and re-alleges and incorporates by reference paragraphs **(1) through (245)** as if fully stated as to the facts that fully support the following claims of United States Constitution and New Jersey Constitution and New Jersey statutes and  New Jersey regulatory laws violations:

## COUNT 1

(247)  United States Constitution Amendments:  First Amendment, Fourth Amendment, Eight Amendment and Fourteenth Amendment have individually and at times collectively, as detailed in this complaint,  been violated by defendants and are briefly framed as follows:

(A) Retaliatory transfer from NSP on 10/2/2019  by defendants Gangi and Nogan based upon written complaints by plaintiff that reported being assaulted by NJDOC employee on 9/21/2019.

(B) Retaliatory deprivation of special personal property privileges -(earned and authorized at NSP)- through pattern and practice of transferring plaintiff to BSP knowing that the 10/2/2019 transfer to BSP by defendants Nogan and Gangi was known would subject plaintiff to unjustified taking of property privileges without any due process of law.

(C)  Retaliatory transfer from NSP to BSP on 10/2/2019 by defendant Gangi after plaintiff wrote a letter critical of his  inappropriate behavior and  the appearance of certain mental conditions, at a meeting he ordered

plaintiff to attend that had him exhibiting, behavior that appeared to be Borderline Personality Disorder with possible comorbidity with Narcissistic Personality Disorder.

(D) Retaliatory transfer into BSP cell B-143 on 10/2/2019 that had no light and bottom bunk bed head clearance of (28 inches) that prevented plaintiff from sitting up in bed that he was forced to live on 23 ½ hours each day, which forced plaintiff to be at un-natural angles where his shoulders were caused great physical pain each time plaintiff made any move to sit, stand, eat, use phone, use kiosk and shower or any other activity connected to that bed, that was used as torture against plaintiff.

(E) Retaliatory Transfer from BSP Trailer 2 Housing Unit to Housing Unit F-cell-128 on 12/4/2019, were plaintiff was again forced 23 ½ hours each day on a bed with (28 inches) head clearance with the same conditions listed in sub-paragraph "D" supra except there was a light in this cell but conditions were made worse by infestation by giant roaches.

(F) Retaliatory theft of O.P.R.A. #17144 on 12/3/2019 which was also stolen to obstruct plaintiff from possession of authorized research NJDOC records without any of the established due process of law.

(G) Retaliatory transfer from Trailer 2 Housing Unit to Housing Unit F-cell-128 to punish for and deter plaintiff's memorialization of and complaining about illegal smoking of cigarettes and stealing inmate welfare funds Direct Tv cable tv vendor services and illegal possession and watching of smuggled flat screen tv in the officer area of Trailer 2 Housing Unit by defendants Whilden, Ross, Devol, Lawson and Rollar.

(H) Retaliatory transfer from Trailer 2 Housing Unit to Housing Unit F-128 by defendants Lawson, Miglio, Rollar and Devol directly following the theft of O.P.R.A. record 17144 on 12/3/2019 and plaintiff's (3 page) complaint letter to defendant Gardner dated 12/3/2019 stolen from mail 12/4/2019.

(I) Retaliatory theft by defendants Pepper and Ng of plaintiff's personal property as described in inmate property claim # 20-01110, without any due process of law and plaintiff is being refused by Cumberland County Court and New Jersey Department of Treasury to obtain any relief, so that there is no meaningful recourse for plaintiff in the appropriate state court as Cumberland County Judge -(Cumberland County is where plaintiff must file his Title 59 Tort Claims Act complaint)- James R. Swift refuses to allow plaintiff to file a complaint against the state of New Jersey nor is the Department of Treasury processing any filed papers provide by plaintiff.

(J) Defendants Pepper and Ng have stolen plaintiff's personal and intellectual property outside all legitimate NJDOC government purpose and without any confiscation nor post confiscation due process of law.

(K) Defendants as sworn officers of the law did on 12/17/2019 punish and or allow punishment of plaintiff in the fabrication of (3) disciplinary charges with spoliation of the document upon which the only alleged evidence came from after plaintiff had written complaints to SID concerning theft by defendants of authorized mail and then theft of complaint mail to SID, and then obstructed the due process of the disciplinary hearing by hiding and or destroying material documentary evidence to alter the hearing outcome against plaintiff and then refusing to allow plaintiff to call witnesses or present documentary evidence in defense thereof.

(L)  Defendant Gramp by policy and practice did prevent plaintiff from providing evidence to defend against false disciplinary charges by defendants Ng and Pepper after plaintiff provided evidence that spoliation of and retaliatory charge were filed against him and needed a polygraph test and that in this particular case the denial of a polygraph examination was a denial of due process and deliberate indifference to meaningful due process disciplinary hearing.

(M)  Defendant Gramp denied plaintiff available NJDOC provision of providing an inmate a polygraph examination where issue of credibility of plaintiff would have established a total defense to the (3) fabricated 12/17/2019 disciplinary charges and denial of the exercise of discretion was in the particular facts known to defendant Gramp at the time when he denied plaintiff's (9 page) polygraph examination request, tantamount to a denial of the measure of due process required of plaintiiff's disciplinary procedural due process and substantive due process.

(N)  All defendants that were provided actual notice that plaintiff had made complaints to SID and that was the reason for his targeted cell search and issuance of (3) fabricated disciplinary charges on 12/17/2019 had a duty to protect plaintiff from continued retaliation for plaintiff's filing of complaints but took no action to stop or prevent continuation of the retaliation and were deliberately indifferent to that retaliation after being directly informed of it.

(O)  Defendants allowed plaintiff to suffer clear manifestly unjust punishment without reviewing the SID evidence and the security evidence choosing to pretend to go through the procedures of disciplinary due process while in fact engaged in a pattern and practice that they used to shield NJDOC employees from exposure of retaliatory conspiracy against plaintiff on 12/17/2019.

(P)  Defendants Sears, Lawson, Miglio, Gramp, Kemble, Gadecki and Emrich stole and or allowed to be stolen  O.P.R.A. records from plaintiff that were authorized for his possession and were paid for, without any due process that is required and or refused to protect plaintiff's right to possess said O.P.R.A. records where there was no threat to safety or security.

(Q)  Defendant DiBenedetto did and defendants were deliberately indifferent to disciplinary hearing procedure that was the product of tainted evidence through intentional actions of defendants Ng and Pepper that created spoliation and where plaintiff was not allowed to actually attend the hearing nor review the documentary evidence to prepare for the hearing nor prepare the appeal of the alleged hearing decision of 1/3/2020.

(R)  Defendants obstructed investigation into the stolen SID and Ombudsman mail and the retaliation for plaintiff's being discovered complaining to Ombudsman and SID and did conspire with each other in a course of conduct that was a practice and policy to obstruct inmate investigations into NJDOC BSP staff retaliation and NJDOC illegal conduct and illegal conditions of confinement that they knew were violations of plaintiff's state and federal rights that the First Amendment protects plaintiff from being violated, and the defendants decided to obstruct investigation of this First Amendment and Fourteenth Amendment violations so that plaintiff was continually damaged as a direct result of that obstruction in violation of 42 U.S.C. 1985.

(S)   Defendants have carefully weighed the policies and procedures requiring them to uphold the rights and privileges of plaintiff and the evidence at trial will show they decided that plaintiff has no right to due process of law in First Amendment right to receive Kosher food even though it is a clearly established right and the denial without any lawful reason and without any due process of law also violates the Fourteenth Amendment.

(T)   The neglect of defendants to stop violations of Constitutional rights is a violation of 42 U.S.C. 1986.

(U)   Defendants facilitation of plaintiff's placement into cells B-143 and F-128 with bottom bunk head clearance height of (28) inches forcing plaintiff to live 23 ½ hours each day with an inmate on the top bunk in a cell designed for One inmate where plaintiff was required to spend his cell time confined to that bottom bunk caused plaintiff unnecessary wanton infliction of pain caused by that bottom bunk and were deliberately indifferent to that bottom bunk placement and were deliberately indifferent to the bed construction that was described by measurement that the bottom bunk head clearance height was (28) inches and knew that plaintiff was required to be placed on bottom bunk by medical restriction and where plaintiff gave defendants specific notice of his destroyed shoulders and the pain that bottom bunk cell assignment caused.

(V)   Defendants design of the bottom bunk head clearances in BSP main compound Housing Units A-F were deliberately designed as a torture chamber and they knew this was too low a head height where the same exact bed frame was manufactured for the bunk beds utilized in the Trailer 2 Housing Unit complex trailers A-F except that those beds were designed with a **spacer** welded that extended the bottom bunk  head height clearance between 7-9 inches. That 7-9 inch spacer was used as a means of rewarding inmates and in the cells plaintiff was forced to occupy B-143 and F-128 those were used to punish and torture plaintiff. Which was an unnecessary infliction of pain upon plaintiff that they were deliberately indifferent to.

(W) On 12/17/2019 defendants Ng and Pepper at BSP seized from cell F-128 personal and intellectual property without authorization and did hide the seizure from fellow NJDOC employees and did so without a warrant and in violation of their oath as sworn New Jersey Correction Police Officers and made this seizure for illegal and evil purpose.

(X)   Defendants Davis, Richards, Sears and Bonds authorized plaintiff's illegal punitive PHD confinement from 1/4/2020 - 1/14/2020 without lawful purpose and without due process of law and also in violation of plaintiff's rights to equal protection of the law.

(Y)   Defendant Falvey obstructed plaintiff from preparing an appeal defense to fabricated charges dated 12/17/2019 by withholding and altering official NJDOC documentary evidence to obstruct plaintiff from defending false disciplinary charges and did also obstruct O.P.R.A. records request documents to obstruct plaintiff from preparing documentary evidence in claim #20-0111.

(Z)   Each defendant in this complaint intended to violate plaintiff's rights to procedural due process and in individual and collective patterns and procedures that were intended and at times did obfuscate established policies and procedures designed to protect and facilitate rights and

privileges, but withheld from plaintiff enforcement of his rights because they determined that the rule of law could be manipulated and obstructed and they could hide it all since the SID investigators willingly assist them as in this case, by withholding investigation evidence in violation of 42 U.S.C. 1985 and 1986, and did also fail to protect plaintiff from such obstruction which caused plaintiff to be obstructed from protected access and possession of reading materials and computer data and written complaints that were filed to address the illegal conditions of confinement identified in this complaint and of illegal treatment while under confinement within NSP, BSP and NJSP correctional facilities.

### COUNT 2

(248)  Claims for supplemental Jurisdiction should be permitted in this complaint as follows:

(Supp. A)  New Jersey Civil Rights Act, N.J.S.A. 10:6-2 (New Jersey Constitution Article 1) for cruel and Unusual Punishment.

(Supp. B)  New Jersey Torts Trespass to Chattles, seizure of intellectual and personal property taken from plaintiff in BSP and NJSP, and intentional infliction of emotional distress.

(Supp. C)  Americans with Disabilities Act violations connected with the 28 inch bunk bed head clearance and plaintiff's pre-existing medical conditions know to defendants at BSP but they were deliberately indifferent to the proximate extreme intractable physical pain caused in cells B-143 and F-128.

(Supp. D)  New Jersey Civil Rights Act New Jersey Constitution Article I retaliation for petitioning Government for redress.

(Supp. E)  New Jersey Law against Discrimination retaliation.

(Supp. F)  New Jersey Law against Disability Discrimination.

(Supp. G)  RLUIPA 42 U.S.C. 2000 bb-2 (4) violation for denial of kosher diet to Jewish inmate (plaintiff), -(Jewish by birth mother)- actively practicing Jewish faith and pre-approved for kosher diet but NJSP above mentioned employees refused for 93 days to provide same to plaintiff.

(Supp. H)  Plaintiff reserves the right when, and if the matter of malicious prosecution claim becomes ripe to file claim against defendants Ng and Pepper.

(Supp. I)  Tort for theft of intellectual property specifically the over Three million typed letters stored in floppy disk computer data that contained two lawsuits, Two book outlines under construction concerning modular prison construction effects upon prisoners and New Jersey corrupt prison system redress of illegal conditions of confinement, and letters of complaint and copies of criminal case sentencing and PCR documents and (4) books on writing books and Muller Report Volumes I & II (438 pages), and (2 clear file folders with hundreds of pages of O.P.R.A. records request documents).

(Supp. J)  New Jersey Tort for theft of personal property from cell F-128 in BSP 12/17/2019.

(Supp. K) Civil RICO violations 18 U.S.C. 1964 (a) & (c)  for pattern of theft of personal and also repeated thefts of intellectual property in the form of floppy disks documents, books, O.P.R.A. records that plaintiff and his family and friends paid for that defendants seized without corrections purpose that involves many defendants who are each in communication with each other and together have decided that they can repeatedly seize intellectual property from plaintiff  knowing they are violating their own NJDOC rules and criminal statutes prohibiting theft, and they are involved in a civil and criminal conspiracy as an organized crime group.

## REQUESTED RELIEF

Wherefore, Plaintiff Darius Heimer Gittens, Pro Se, demands:

Monetary damages

Punitive damages in the amount of $75,000 against each defendant.

Attorney fees.

fees and costs. Appointment of a special master.

Injunctive relief.

## CERTIFICATION

Darius Heimer Gittens, Pro Se, hereby certified pursuant to 18 U.S.C. 1746 that he has read this (248 paragraph) (57) page complaint, and knows it's content to be true and correct to his own knowledge.

DATED: May 18, 2021

## J U R Y   D E M A N D

Plaintiff hereby demands a trial by jury.

_____
Darius Heimer Gittens
New Jersey State Prison

Page (57 of (57)